**STATE of South Dakota, Plaintiff
and Appellee,**

v.

**George BIG HEAD, Defendant
and Appellant.**

No. 14376.

Supreme Court of South Dakota.

Argued May 22, 1984.

Decided Feb. 20, 1985.

Robert B. Vrooman, Asst. Atty. Gen., Pierre, for plaintiff and appellee; Mark V. Meierhenry, Atty. Gen., Pierre, on the brief.

Terry L. Pechota of Finch & Viken, Rapid City, for defendant and appellant.

MORGAN, Justice.

This appeal is from a jury trial in which George Big Head (defendant) was convicted of vehicular homicide under SDCL 22–16–41 and from the trial court's imposition of a six-year prison sentence upon him. We affirm.

The charge of vehicular homicide resulted from an automobile collision which occurred at approximately 8:00 a.m. on May 9, 1983, when defendant's motor vehicle, proceeding south on Highway 79, enroute from Rapid City to Hot Springs, crossed the center line and collided headon with a northbound vehicle. The northbound vehicle carried the decedent, who was driving, and his wife.

State Trooper David Driscoll received a report of the collision at about 8:13 a.m. and arrived at the scene approximately seventeen minutes later. Upon arrival, Driscoll went directly to defendant's car and found him lying in the front seat of the vehicle with his head hanging out the driver's side window. Upon checking defendant's pulse and breathing to ascertain his condition, Driscoll detected "a strong odor of alcoholic beverage" coming from defendant's mouth. Driscoll then checked the condition of the passenger and driver of the other vehicle and determined that the driver was deceased. At that time, Driscoll talked to an eyewitness, a driver who had been following defendant, and was informed of defendant's errant driving and that the collision occurred when defendant's vehicle crossed the center line into the northbound lane. Driscoll then returned to defendant's vehicle and observed that defendant's eyes were heavy and bloodshot and that defendant appeared "sleepy, dopey, out of it." Driscoll's observations upon his return to defendant's vehicle led him to the opinion that defendant "was under the influence of alcohol, [that] he was drunk." A second trooper arrived at the accident site at approximately 9:00 a.m. to assist in the investigation. This trooper witnessed the arrest and made field observations of defendant in order to determine whether or not defendant was under the influence of alcohol. The second trooper also detected "a very strong odor of an alcoholic beverage" coming from defendant's mouth. Based upon both officers' observations, information provided by eyewitnesses, and the other driver's death, Driscoll arrested defendant for vehicular homicide, pursuant to SDCL 22–16–41.

The seven issues defendant denominates in his brief to this court pose five basic questions for review:

1. Whether SDCL 22–16–41 is an unconstitutional violation of defendant's right to due process and equal protection because it is vague and permits selective enforcement?

2. Whether the trial court erred when it refused to suppress the blood test results in light of (a) the officer's failure to inform the defendant of his right to refuse to take the test; and (b) the officer's failure to properly preserve the blood samples?

3. Whether the evidence was sufficient to warrant conviction under SDCL 22–16–41?

4. Whether the prosecutor's conduct was improper and prejudicial when he: (a) Elicited testimony of the medics on the percentage of calls related to alcohol;

(b) Elicited testimony of the troopers on the percentage of their alcohol arrests that resulted in convictions; and (c) Cross-examined the defendant as to the presence of marijuana in his car.

5. Whether the imposition of a six-year sentence was cruel and inhuman punishment under the facts of this case?

 We first examine the constitutionality of SDCL 22–16–41. This court will review a law's constitutionality only when necessary for a determination upon the merits of a cause under consideration, and will first ascertain whether a construction of the statute, which avoids the constitutional question, is fairly possible. *Aberdeen Ed. Ass'n. v. Aberdeen Bd. of Ed., Ind. Sch. D.*, 88 S.D. 127, 215 N.W.2d 837 (1974). This court will uphold legislative enactments unless they are clearly and unmistakably unconstitutional. *State v. Morrison*, 341 N.W.2d 635 (S.D.1983); *State v. Crelly*, 313 N.W.2d 455 (S.D.1981); *Frawley Ranches, Inc. v. Lasher*, 270 N.W.2d 366 (S.D.1978); *County of Tripp v. State*, 264 N.W.2d 213 (S.D.1978). All presumptions are in favor of the constitutionality of a statute and continue so until the contrary is shown beyond a reasonable doubt. *Independent Community Bankers Ass'n v. State*, 346 N.W.2d 737 (S.D.1984); *Crowley v. State*, 268 N.W.2d 616 (S.D.1978).

 This court must determine as best it can the legislature's intent in order to construe the statute and determine its constitutionality. *State v. Janisch*, 290 N.W.2d 473 (S.D.1980). The words the legislature used are presumed to convey their ordinary, popular meaning, unless the context or the legislature's apparent intention justifies departure from the ordinary meaning. *Oahe Conservancy Subdistrict v. Janklow*, 308 N.W.2d 559 (S.D.1981); SDCL 2–14–1. Defendant contends that the statute is void for vagueness and therefore violates his right to due process. Statutes violate due process when the prohibited act or omission is expressed in terms so vague that reasonable people of ordinary intelligence might apply them differently. *Papachristou v. City of Jacksonville*, 405

U.S. 156, 92 S.Ct. 839, 31 L.Ed.2d 110 (1972); *United States v. Harriss*, 347 U.S. 612, 74 S.Ct. 808, 98 L.Ed. 989 (1954). Criminal statutes must adequately apprise the public of the activity proscribed and must set out "explicit standards" for enforcement or, in other words, define the criminal offense with "sufficient definiteness." *Kolender v. Lawson*, 461 U.S. 352, 103 S.Ct. 1855, 75 L.Ed.2d 903 (1983); *Broadrick v. Oklahoma*, 413 U.S. 601, 93 S.Ct. 2908, 37 L.Ed.2d 830 (1973). Most importantly here, the statutory language may not be so vague that selective or discriminatory enforcement is permitted. *Kolender, supra; Smith v. Goguen*, 415 U.S. 566, 94 S.Ct. 1242, 39 L.Ed.2d 605 (1974); *Coates v. City of Cincinnati*, 402 U.S. 611, 91 S.Ct. 1686, 29 L.Ed.2d 214 (1971).

 In *State v. Primeaux*, 328 N.W.2d 256 (S.D.1982), this court set out the test for determining whether criminal statutes are unconstitutionally vague.

A crime must be statutorily defined with definiteness and certainty. A statute which either forbids or requires the doing of an act in terms so vague that men of common intelligence must necessarily guess at its meaning and differ as to its application violates the first essential of due process. A criminal statute must give a person of ordinary intelligence fair notice that his contemplated conduct is forbidden. (citations omitted)

328 N.W.2d at 258.

SDCL 22–16–41 provides:

Any person who, while under the influence of an alcoholic beverage, any controlled drug or substance, or a combination thereof without design to effect death, operates or drives a motor vehicle of any kind in a negligent manner and thereby causes the death of another person is guilty of vehicular homicide. Vehicular homicide is a Class 4 felony.

Defendant contends that two phrases in SDCL 22–16–41 are undefinable and thereby render the statute void for vagueness. The two phrases are: (1) "under the influence of an alcoholic beverage," and (2)

"negligent manner." This court has said that the legislature's failure to enact a definition does not preclude this court from providing a necessary definition. *Janisch, supra.* The offense of driving under the influence has been statutorily prohibited in this state since the early 1900's. The trial court instructed the jury:

[I]n order to be driving a motor vehicle while under the influence of an alcoholic beverage, it is not essential that the driver of the motor vehicle should be so intoxicated that he cannot safely drive or be in actual physical control of a motor vehicle.

The expression "under the influence of an alcoholic beverage" covers not only all well known and easily recognized conditions and degrees of intoxication, but *any* abnormal mental or physical condition which is the result of indulging in *any* degree in an alcoholic beverage and which tends to deprive him of that clearness of intellect and control of himself which he would otherwise possess. (emphasis added)

These instructions adequately define "driving under the influence" as that phrase appears in SDCL 32–23–1, the driving under the influence statute, and SDCL 22–16–41, the vehicular homicide statute. We perceive no reason why the grounds for violation of the latter statute would be different from those required for violation of the former.

Defendant also contends that the term "negligent manner" is vague, in that it does not adequately delineate the proscribed conduct and that the term does not provide adequate notice of the degree of negligence required to subject a driver under the influence to prosecution for vehicular homicide. This term is statutorily defined within SDCL Title 22. SDCL 22–1–2(1)(e) states: "The words 'neglect, negligently' and all words derived thereof, import a want of attention to the nature or probable consequences of an act or omission which a prudent man ordinarily bestows in acting in his own concerns[.]"

In *State v. Munnell,* 344 N.W.2d 883, 886–87 (Minn.App.1984), the Minnesota Court of Appeals interpreted the phrase "in a negligent manner while under the influence of alcohol" as it is used in that state's vehicular homicide statute. That court cited the United States Supreme Court's decisions in *Connally v. General Const. Co.,* 269 U.S. 385, 46 S.Ct. 126, 70 L.Ed. 322 (1926), and *International Harvester Co. v. Kentucky,* 234 U.S. 216, 34 S.Ct. 853, 58 L.Ed. 1284 (1914), for the proposition that due process requires statutes which create crimes to prescribe *reasonably* ascertainable standards in order to provide advance notice of just what acts are required or forbidden. 344 N.W.2d at 886. "The standards should be such as are likely to be understood by men of ordinary intelligence and capable of reasonably certain application to the facts of particular cases." 344 N.W.2d at 885–86.

 The courts have, over the years, established a standard which provides advance notice of the acts and omissions that constitute negligence. Due process requirements are satisfied when the standard of conduct is specified in terms that have evolved from reasonably definite standards either according to the common law or by long and general usage. *State v. Northwest Poultry & Egg Co.,* 203 Minn. 438, 281 N.W. 753 (1938); *Connally, supra; International Harvester Co., supra.* The term "negligence" and its derivatives satisfy this test. *Munnell, supra.*

 Defendant also contends that SDCL 22–16–41 violates his right to due process because it does not require the state to show any culpable mental state or intent. Defendant recognizes that there are general intent crimes, but suggests that historically general intent crimes are offenses involving lesser penalties. We disagree. "[I]t is widely understood that the legislature may forbid the doing of an act and make its commission a crime without regard to the intent or knowledge of the doer." *State v. Nagel,* 279 N.W.2d 911, 915 (S.D.1979); *see State v. Martin,* 85 S.D. 587, 187 N.W.2d 576 (1971).

In *State v. Rash*, 294 N.W.2d 416, 417 (S.D.1980), we noted that specific intent has been defined as some intent in addition to the intent to do the physical act which the crime requires, while general intent means an intent to do the physical act, or in some cases reckless performance of the physical act, the crime requires. We then said:

> [S]pecific intent crimes would be limited only to those crimes which are required to be committed either "purposefully" or "knowingly," while general intent crimes would encompass those crimes which can be committed either "recklessly" or "negligently." Thus, in order to commit a specific intent crime, an offender would have to subjectively desire or know that the prohibited result will occur, whereas in a general intent crime, the prohibited result need only be reasonably expected to follow from the offender's voluntary act, irrespective of any subjective desire to accomplish such result.

294 N.W.2d at 417; *quoted in Primeaux, supra. See, State v. Huber*, 356 N.W.2d 468 (S.D.1984) (definitions of general and specific intent).

■■■ The vehicular homicide statute, SDCL 22-16-41, is clearly a general intent statute. The statute would not accomplish the legislature's purpose, which was to prevent alcohol-related deaths on our state highways, if a showing of specific intent was required for a conviction thereunder.

■■■ Defendant's equal protection argument, that the state might have selectively prosecuted under the vehicular homicide or manslaughter statute, fails under the test this court set out in *State v. Secrest*, 331 N.W.2d 580 (S.D.1983). "To avoid prosecution for a criminal offense upon equal protection grounds, a defendant must show that the government exercised selective enforcement of the law upon an invidious discriminatory basis." 331 N.W.2d at 583. (citations omitted) This court has recognized the long-standing rule that when an action violates two criminal statutes, the government may prosecute under either, providing it does not discriminate against any class of defendants. 331 N.W.2d at 583-84. Defendant has not argued that he is a member of a particular class of defendants who are prosecuted under the vehicular homicide statute as opposed to the second-degree manslaughter statute.

For his second principal issue, defendant urges that the trial court committed error when it admitted his blood test results; first, because the arresting officer failed to inform him of his right to refuse to take the test and, second, because the officer failed to properly preserve the sample and thereby caused an inaccurate result.

■■■ Defendant's first complaint is controlled by our holding in *State v. Hartman*, 256 N.W.2d 131 (S.D.1977). That case involved second-degree manslaughter and the use of blood samples and blood test results were challenged because the arresting officer failed to advise the accused of his right to refuse the test under the implied consent law. The majority opinion effectively overruled *State v. Buckingham*, 90 S.D. 198, 240 N.W.2d 84 (1976), and held that the test results were admissible. 256 N.W.2d at 134-35. In discussing the effect of a law enforcement officer's failure to comply with the implied consent statute, the majority found that the exclusionary rule established in *Buckingham* was not necessary because the statute itself supplied a sufficient deterrent to law enforcement officers, to-wit: (1) the department could not revoke the driver's license of anyone who refused the test without knowledge of the implied consent statute; and (2) the state forfeits the benefit of the statutory presumption, thus requiring the state to put in properly qualified expert evidence to demonstrate the physiological effect of a specific blood-alcohol content upon the defendant. 256 N.W.2d at 135. In this case, the State did solicit expert testimony regarding the psychological effect of alcohol on defendant and the trial court did not instruct as to the presumptions. Under our previous holding in *Hartman*, the trial court committed no error.

■ The allegation that the blood samples Trooper Mayes delivered for testing were not adequately preserved, is frivolous. Two other samples which were kept at the hospital until picked up by the tester showed almost the same blood-alcohol content as those delivered by Mayes. Although defendant's expert testified that the chemical used to preserve the blood was not present in sufficient quantity to meet the standards used in Colorado, his state, he was not asked and did not say that the samples transported and temporarily kept in the patrol car were in any way poorly preserved. The results defendant's expert arrived at were similar to those obtained by the State and indicated a blood alcohol level above .10 on both samples. The jury considered testimony by both experts and chose to believe the State's witness. The officers' observations, the testimony of the witnesses who observed defendant's driving, the witnesses who smelled his breath, and defendant's own admissions, are sufficient for conviction without admission of the blood test results. *See State v. Hall*, 353 N.W.2d 37 (S.D. 1984); *State v. Roadifer*, 346 N.W.2d 438 (S.D.1984).

We next consider the defendant's argument that the trial court erred in overruling his motion for directed verdict made at the close of the State's case on the basis that the evidence against him was insufficient. Defendant also avers the evidence is insufficient to support the verdict. In the light of the record in this case, these issues are not frivolous, they are downright audacious.

The record discloses that defendant had been drinking for approximately a six-hour period, ending at 3:00 or 4:00 a.m. He had not slept in at least the previous twenty-four hours, but nevertheless drove out of Rapid City at 7:30 a.m. enroute to Hot Springs. The vehicle he was driving was badly out-of-line. It needed upper ball joints, an idle arm and steering rod. There was so much play in the steering wheel that a constant struggle was required to keep the car in the lane of traffic. To make matters worse, an electrical fire apparently broke out in the tape deck. The defendant did not stop his vehicle to deal with that emergency; he chose to fight the fire as he continued down the road. The foregoing is the defendant's version of what happened.

Additionally, testimony was elicited at trial from three eyewitnesses who had observed defendant swerve in his own lane, partially cross the center line on six or eight occasions and completely cross the center line three or four times. There is no question but what defendant's southbound car was completely in the opposing lane of traffic when it struck the decedent's northbound vehicle headon. The record also contains the testimony of two state troopers, one paramedic, and one emergency medical technician, who all testified upon adequate foundation that in their respective opinions the defendant was under the influence of alcohol. The State's expert witness estimated that defendant's blood-alcohol content was .215 at the time of the accident and that given the physiological effects of having .215 blood-alcohol content the defendant would have been intoxicated under the trial court's instructions. The record further discloses that decedent died as a result of injuries received in the collision.

*Hartman, supra,* quoted *State v. Shank,* 88 S.D. 645, 226 N.W.2d 384, 387 (1975), for the proposition that " 'In determining the sufficiency of the evidence on appeal the only question presented to this court is whether or not there is evidence in the record which, if believed by the jury, is sufficient to sustain a finding of guilty beyond a reasonable doubt.' " 256 N.W.2d at 136. We hold that without any question, the trial court did not err in overruling defendant's motion for directed verdict and that in the light of the entire record there is more than sufficient evidence to support the jury's verdict.

■ We next consider defendant's claim of prosecutorial misconduct in the solicitation of improper testimony on direct examination of certain witnesses in the State's case-in-chief and in cross-examina-

tion of the defendant. The two ambulance attendants who testified as to the defendant's condition were also asked what percentage of their ambulance calls were alcohol related. Their responses varied from fifty percent to as high as eighty percent. The arresting officer, Trooper Driscoll, was asked during his testimony what percentage of his DWI arrests resulted in convictions. He responded that ninety percent result in convictions or guilty pleas. We agree with the defendant that this testimony was totally irrelevant, inflamatory and highly prejudicial. It demonstrates a blatant overreaching on the part of the prosecution. We note, however, that defense counsel, who is not involved in this appeal, failed to object when the various questions were asked, thus permitting the responses. He moved to strike the testimony or for a mistrial in chambers on the morning following completion of the testimony. The motion was denied; it was too late to lock the barn door, the horses had departed. Under authority of *Johnson v. John Deere Co.*, 306 N.W.2d 231 (S.D.1981), and *Till v. Bennett*, 281 N.W.2d 276 (S.D.1979), we hold that the defendant has waived his right to object to this testimony. We do not find, in light of this record, that admission of these questions and answers arises to the status of "plain error" for in the light of the overwhelming evidence and defendant's admissions detailed in the third issue above, the admission of this testimony would have been harmless error.

■ On cross-examination, the prosecutor asked the defendant whether his car smelled of marijuana the night before the accident. This was also absolute prosecutorial error. In this instance, however, defendant's counsel did object. The trial court properly sustained the objection before the defendant responded. The prosecutor asked no further questions regarding marijuana and went on to another line of questioning.

That we find no reversible error on this issue does not make the prosecutorial conduct less egregious. We here restate our warnings most recently given in *State v. Gage*, 302 N.W.2d 793, 798 (S.D.1981):

" '[W]e must remind prosecutors that it is the foundation of the criminal justice system to see that the defendant and every defendant gets his day in court and a *fair trial*. This burden weighs as heavily on prosecutors as it does on judge, jury and defense counsel.' " (citations omitted) (emphasis in original)

■ Finally, we examine defendant's argument that the six-year prison sentence imposed is cruel and inhuman punishment under the facts of this case. This court has continuously held that sentences within the statutory limits will not be overturned. *State v. Curtis*, 298 N.W.2d 807 (S.D.1980); *State v. O'Blasney*, 297 N.W.2d 797 (S.D. 1980). The punishment here does not shock the conscience. *See O'Blasney, supra.* Defendant had completed treatment and returned from an alcohol treatment center a few months before the accident. He had two prior DWI convictions. He refused, against advice, to follow up with Alcoholics Anonymous. The possible sentence was ten years and $10,000; he got only six years and was given credit for time served. We hold the sentence to be neither cruel or inhuman.

We affirm.

FOSHEIM, C.J., WOLLMAN, J., and DUNN, Retired Justice, concur.

HENDERSON, J., concurs specially.

WUEST, Circuit Judge, Acting as Supreme Court Justice, not participating.

HENDERSON, Justice (specially concurring).

### PRESERVATION OF EVIDENCE

Concerning the blood test issue in this case, we are confronted with the question whether the Fourteenth Amendment also demands that the state preserve *potentially exculpatory* evidence on behalf of appellant. *See California v. Trombetta*, —— U.S. ——, 104 S.Ct. 2528, 81 L.Ed.2d 413 (1984).

In *Trombetta,* an Omicron Intoxilyzer was involved, the breath samples were not preserved, and this was held to not be a due process transgression. The United States Supreme Court did not apply the standards developed in *Brady v. Maryland,* 373 U.S. 83, 83 S.Ct. 1194, 10 L.Ed.2d 215 (1963). Rather, the Fourteenth Amendment was viewed in a more expansive, broad manner. In this case, there are blood samples taken from appellant, unrefrigerated for several hours, allegedly kept in the glove compartment of an automobile on a hot day, and then tested. Therefore, constitutionally, can a negligent preservation of evidence rise to a greater height than a destruction of potentially exculpatory evidence?

What is the duty of the state to preserve potentially exculpatory evidence? The answer to this question is best given in a reading of *Killian v. United States,* 368 U.S. 231, 82 S.Ct. 302, 7 L.Ed.2d 256 (1961), and *Trombetta.* Suffice it to say, criminal prosecutions must still comport with prevailing notions of fundamental fairness. This appellant, and any defendant in a criminal case, must be afforded a meaningful opportunity to present a complete defense. In *Trombetta,* the highest court of this land reannounces "what might loosely be called the area of constitutionally guaranteed access to evidence." *Trombetta,* — U.S. at —, 104 S.Ct. at 2532, 81 L.Ed.2d at 419 (quoting *United States v. Valenzuela-Bernal,* 458 U.S. 858, 867, 102 S.Ct. 3440, 3447, 73 L.Ed.2d 1193, 1203 (1982)).

*Trombetta* focused, as I see it, on the good faith of officers and exercising their duty within normal practices. A rigorous and systematic system of capturing and preserving blood alcohol samples as evidence appears to be eclipsed by *Trombetta* (breath samples). In the facts at hand, four different blood samples of appellant tested by two experts, had varying blood alcohol content. Appellant's expert testified the blood alcohol level of one sample

was .116 and another was .109; the State's expert testified that the one sample tested out at .193 and another at .178. These are widely varying tests which reflect a high alcoholic content in appellant's blood. The negligence in preserving the blood samples is there; such a practice of hauling around blood samples in a car on a hot day is poor law enforcement procedure. Ipso facto, it does not amount to an exercise of bad faith; it is, nevertheless, not in keeping with normal practices. Due to the high range of the alcohol content in all four samples, in the words of *Trombetta,* "the chances are extremely low that preserved samples would have been exculpatory" had the negligence by the law enforcement officers not here occurred. *Trombetta,* — U.S. at —, 104 S.Ct. at 2534, 81 L.Ed.2d at 422. There was no conscious effort by the state troopers to suppress exculpatory evidence. I conclude there is no Fourteenth Amendment violation.

## PROSECUTORIAL MISCONDUCT

Improper prosecutorial conduct demands immediate action by defense counsel: (1) Make objection to improper questions or misstatements forthwith; (2) move for mistrial in chambers; and (3) if the motion is denied, specifically request an instruction. *State v. Kidd,* 286 N.W.2d 120, 123 (S.D. 1979) (Henderson, J., concurring specially) (citing *State v. Christiansen,* 46 S.D. 61, 67, 190 N.W. 777, 779 (1922)); *Schlagel v. Sokota Hybrid Producers,* 279 N.W.2d 431, 434 (S.D.1979) (Henderson, J., concurring specially). Counsel in South Dakota must learn to move with dispatch, act with alacrity, and be prompt in responding to prosecutorial misconduct, lest they be found wanting at the appellate level.

## PUNISHMENT

The Eighth Amendment to the United States Constitution provides, in simple language: "Excessive bail shall not be required, nor excessive fines imposed nor cruel and unusual punishments inflicted." *

---

* S.D. Const. art. VI, § 23, provides: "Excessive bail shall not be required, excessive fines imposed, nor cruel punishments inflicted." Note

Appellant was sentenced to six years' imprisonment. He claims this was "a cruel and inhuman" sentence; further, that the sentence shocks the conscience. At the time of sentencing, he was twenty-two years old with a record of no felonies but two D.W.I. convictions. An innocent man was killed on the highway and the evidence is overwhelming of appellant's guilt.

Appellant's argument, simply put, is that the sentence is constitutionally offensive. That the sentence is beyond statutory limits is not advanced. There is no claim of a violation of statutory sentencing. Therefore, I restrict my views to the constitutional argument.

In my dissent in *State v. Helm*, 287 N.W.2d 497, 499 (S.D.1980), I expressed a profusion of thought on sentencing laced with and honed by federal decisions and past United States Supreme Court decisions on the Eighth Amendment. The constitutional complexion of that dissent was honored and quoted in part by the United States Supreme Court in *Solem v. Helm*, 463 U.S. 277, 103 S.Ct. 3001, 77 L.Ed.2d 637 (1983). *State v. Helm*, 287 N.W.2d 497, cited in the majority opinion, was reversed. Therefore, I do not wish to expressly or impliedly affix my imprimatur on the latter case. On sentencing, I wrote in *Helm*, 287 N.W.2d at 500:

> While this court has been traditionally reluctant to disturb a sentence on appeal, we nonetheless have long recognized the vagaries that inhere in the sentencing process. We stated in *State v. Bad Heart Bull*, 257 N.W.2d 715, 720 (S.D. 1977): "Although punishment by imprisonment is not per se cruel and unusual it may be constitutionally offensive when the duration of the sentence prescribed is so excessive or disproportionate to the crime as to shock 'the conscience and reason of men generally,'" citing *State v. Becker*, 3 S.D. 29, 40, 51 N.W. 1018, 1022 (1892). I do not choose to be shackled by the precedent of this court, namely, that a sentence within the statutory limits will not be disturbed on appeal. I

that the word "unusual" is deleted from this

find the language of the majority opinion especially alarming in light of the reenactment of the death penalty in this state. There are instances, though rare, where departure from this precedent is mandated. Thus, the discretion of the trial court is not boundless, nor is the function of this court merely perfunctory with regard to the review of a criminal sentence.

Those views, I believe, are still sound.

A six-year sentence passes constitutional muster: (1) The duration of the sentence prescribed is not so excessive or disproportionate to the crime as to shock the conscience and reason of men generally nor (2) the conscience of this Court. Therefore, I would likewise affirm this conviction of vehicular homicide.

