STATE of South Dakota, Plaintiff and Appellee,

v.

Kevin DIRK, Defendant and Appellant.

No. 14573.

Supreme Court of South Dakota.

Considered on Briefs Nov. 30, 1984.

Decided Feb. 27, 1985.

Clair B. Ledbetter, Asst. Atty. Gen., Pierre, for plaintiff and appellee; Mark V. Meierhenry, Atty. Gen., Pierre, on the brief.

Jane M. Farrell of Farrell, Farrell & Ginsbach, Hot Springs, for defendant and appellant.

WOLLMAN, Justice.

Defendant was found guilty by a jury of having committed the crime of third-degree burglary. SDCL 22–32–8. We affirm.

Sometime during the evening of November 18, 1983, defendant and Catherine Starr decided to go to a movie. Defendant and Ms. Starr had been drinking together earlier in the day, having consumed a half pint of whiskey and four or five quarts of wine referred to in the record as "Mad Dog 20–20." The two set out for the movie, accompanied by two nieces and one nephew of Ms. Starr. As the group walked by the business establishment known as the Pioneer Trading Post (Trading Post), defendant informed Ms. Starr that he had to relieve himself, whereupon he walked around the side of the Trading Post while the others continued walking towards the theater. Upon rejoining the group, defendant told Ms. Starr that he had broken a window.

After the movie, Ms. Starr returned to her mobile home with defendant, where they resumed drinking. When Ms. Starr refused defendant's request that she return with him to the Trading Post, defendant became angry and began striking Ms. Starr. Ms. Starr left the mobile home to escape the beating and sat under a tree near a neighboring mobile home, where she continued to drink her wine. When she returned to her mobile home later that night, she discovered that defendant was not there.

Several days before this incident Ms. Starr had accompanied defendant to the Trading Post for the purpose of pawning a keychain. As they left the store that day, defendant remarked to Ms. Starr that there were a lot of nice things in the store.

During the evening of November 18, 1983, defendant was wearing a brown corduroy coat that belonged to one of Ms. Starr's friends. Defendant had worn the coat on several earlier occasions.

At 1:56 a.m., November 19, 1983, an alarm sounded at the Hot Springs Police Department indicating an intrusion at the Trading Post. The investigating officers and the owner of the store discovered a broken window on the south side of the building. It was determined that someone had entered the building, apparently cut-

ting himself on the broken glass, and had removed several handguns from a case in the front part of the store. There were several blood spots on the floor along the side of and behind the gun case. The handguns, together with several other items, were found in a box sitting on a bench below the broken window through which the entry had been made. A rifle had also been moved to that area.

The investigating officers discovered a brown corduroy coat, a suitcase, a maroon purse containing a piece of broken glass and a kitchen knife, and a honing steel lying under a trailer that was parked near the broken window. There was a flashlight and a sock with a red and blue top in the pockets of the coat.

A white sock with blue and red striping was found under the rear wheel of a car that was parked near the Trading Post. The officers observed that there was a moist red substance on the sock.

Shortly after 3:00 a.m. on November 19, Chief of Police Gary Larson, who had just completed his on-the-scene interrogation of one of the two persons whom the investigating officers had observed in the immediate area upon responding to the alarm (both of whom were determined not to have participated in the break-in) observed defendant walking in the alley close to the Trading Post. Upon being requested by Officer Larson to produce some identification, defendant displayed his driver's license. Defendant then complied with Officer Larson's request for permission to look at defendant's hands. Officer Larson observed a cut between the thumb and index finger on defendant's left hand. The cut appeared to have recently been bleeding. Defendant was taken to the police station, where he was arrested on a charge of possessing marijuana following an inventory of the contents of his pockets. He was later formally arrested and charged with the offense giving rise to this prosecution.

Ms. Starr was arrested at her mobile home at approximately 4:00 a.m. on November 19, 1983. She testified on behalf of the state under a grant of immunity. She identified the coat found under the trailer as the one that defendant had been wearing on the night of November 18–19 and identified the other items as belonging to her mother. She identified the socks found in the coat pocket and under the car as being similar to ones that she owned.

A specimen of defendant's blood, taken pursuant to court order, was sent to the forensic laboratory of the Division of Criminal Investigation in Pierre, along with specimens of the dried blood found in the interior of the Trading Post.

One of the witnesses for the state was Rex Riis, who at the time of trial had been employed by the Division of Investigation's forensic laboratory for some five and one-half years. Riis holds a Master of Science degree in zoology. His graduate work consisted primarily of a special study in physiology and serology. In addition to his regular academic course of study, Riis has had additional graduate level training in biochemical analysis of blood stains at the Federal Bureau of Investigation Academy in Quantico, Virginia. He has also attended a two-week course in serology and forensic applications thereof offered by the Serologic Institute of Emeryville, California. He has also had forensic serology training at the state crime laboratories in Iowa, Montana, Washington, and Minnesota. Riis had testified in other courts regarding the theories and techniques used in analyzing blood and blood tissue and the results of his analysis of various samples of blood and blood tissue.

Over defendant's objections, Riis was permitted to testify regarding the tests that he had performed with respect to the samples of dried blood taken from the Trading Post, the blood on the sock that was found beneath the car, and the blood sample taken from defendant. The tests conducted by Riis included the determination of the blood group to which the samples belonged, together with an analysis of the enzymes esterase and phosphoglucomutase. Riis testified that the tests indicated that all of the samples were esterase type one and phosphoglucomutase type one and

that they all belonged to blood group A. Riis stated that these tests were recognized as being scientifically reliable and accurate. He testified that eighteen to nineteen percent of the total population possesses blood with the characteristics revealed by the tests. Stated conversely, the tests excluded some eighty-one percent of the general population as possible sources of the blood found within the Trading Post and on the sock.

We turn, then, to the issues raised by defendant.

## I.

### Admissibility Of Expert Testimony Regarding Blood Identification Factors Other Than A, B, O Grouping.

Defendant contends that the court erred in denying his motion in limine objecting to Riis' testimony regarding the enzyme analysis of the blood samples. Defendant's objection to the admission of this testimony was based upon Riis' alleged lack of credentials as an expert witness and upon the ground that the enzyme analysis identification process is not a type of test reasonably relied upon by experts in the field. We hold that neither objection is well taken.

 The admission of expert testimony is governed by our court-adopted rules of evidence. SDCL 19–15–2 provides:

If scientific, technical, or other specialized knowledge will assist the trier of fact to understand the evidence or to determine a fact in issue, a witness qualified as an expert by knowledge, skill, experience, training, or education, may testify thereto in the form of an opinion or otherwise.

As we indicated in *State v. Shell*, 301 N.W.2d 669 (S.D.1981), the foregoing rule is patterned after Rule 702 of the Federal Rules of Evidence. In *Shell* we adopted the same standard of review with respect to our rule that the federal courts have applied to Rule 702. Under this standard, the trial court has broad discretion in determining the qualifications of expert witnesses and in admitting expert testimony. The

trial court's decisions in this regard will not be reversed in the absence of a clear showing of an abuse of that discretion.

 We hold that there was no abuse of discretion by the trial court in admitting the challenged testimony in view of Riis' academic and post-academic training, as well as his experience in conducting serologic tests of blood samples. As did the trial court in *Shell, supra,* the trial court gave the jury in the present case an appropriate instruction concerning its right to give the expert testimony the weight to which it found it to be entitled.

 Likewise, we hold that the trial court did not err in overruling defendant's challenge to the scientific reliability of the enzyme analysis procedure.

In *State v. Helmer*, 278 N.W.2d 808 (S.D. 1979), we applied to breathalyzer test results the test of admissibility of scientific evidence set forth in *Frye v. United States,* 293 Fed. 1013 (D.C.Cir.1923). To be admissible under the *Frye* test, the scientific principle or technique must be shown to have "gained general acceptance in the particular field in which it belongs." 293 Fed. at 1014.

In support of his contention that the enzyme testing procedure of dried blood samples does not meet the test of scientific reliability set forth in *Frye*, defendant cites Johakait, "Will Blood Tell? Genetic Markers in Criminal Cases," 31 Emory L.J. 833, 880 (1982):

While experiments with laboratory-prepared bloodstains indicate that blood group factors persist in aged samples, there is no guarantee that these markers will remain unchanged in evidential material. Phenotypes in some contaminated, dried, or putrified blood may be in an altered and degraded state *which gives an unambiguous but false reading.*

(emphasis in original) (footnote omitted) (quoting Zajac, "Bloodstain Phenotyping in Crime Laboratory Casework," *Handbook for Forensic Individualization of Human Blood and Bloodstains* at 160 (B. Grunbaum ed. 1981)).

We conclude that Riis' testimony regarding the acceptance by forensic serologists of the tests that he employed in this case constituted an adequate basis for the trial court's determination that the results of those tests should be presented to the jury.

Although we are satisfied that the *Frye* test of admissibility was satisfied in the case before us, we note that with the advent of the Federal Rules of Evidence, and in particular Rule 702, the time may have come to reexamine the *Frye* standard. For excellent discussions of this issue, *see* McCormick, "Scientific Evidence: Defining a New Approach to Admissibility," 67 Iowa L.Rev. 879 (1982) and *State v. Brown*, 297 Or. 404, 687 P.2d 751 (1984). We need not make that reexamination here, however, given our holding on the admissibility of the challenged testimony.

## II.

### Refusal To Give a Lesser Included Offense Instruction.

Defendant was charged with violating SDCL 22–32–8, the third-degree burglary statute. The trial court refused to give defendant's lesser included offense instruction based upon SDCL 22–32–16, which at all times material herein provided that "[a]ny person who, under circumstances not amounting to burglary, enters a structure with intent to commit any crime is guilty of a Class 1 misdemeanor."

Whether the misdemeanor offense set forth in SDCL 22–32–16 is included within the offense of third-degree burglary specified by SDCL 22–32–8 is a question on which our decisions have provided a less than clear-cut, consistent answer. *Compare, e.g., State v. O'Connor*, 265 N.W.2d 709 (S.D.1978), with *State v. Kafka*, 264 N.W.2d 702 (S.D.1978); *State v. Blakey*, 332 N.W.2d 729 (S.D.1983); and *State v. Rodriguez*, 347 N.W.2d 582 (S.D.1984). Perhaps it was because of the difficulty in determining what factual situation would merit the application of this statute that the legislature repealed SDCL 22–32–16 in 1984. *See* 1984 S.D.Sess.Laws, ch. 170, § 1. In any event, the facts of the case

before us support the trial court's determination that defendant was not entitled to the requested instruction inasmuch as there was no question but that the offense of third-degree burglary had been committed by the person who entered the store. *State v. Oien*, 302 N.W.2d 807 (S.D.1981); *State v. Kafka, supra* (Zastrow, J., concurring specially).

## III.

### Defendant's Motion For Judgment Of Acquittal.

Defendant contends that the trial court should have granted his motion for judgment of acquittal made at the close of the prosecution's case. SDCL 23A–23–1. Our standard of review in passing on the propriety of the denial of a motion for judgment of acquittal is whether the state has made out a prima facie case from which the jury could reasonably find the defendant guilty. Questions of credibility and of the weight of the evidence are for the jury. *State v. Blakey, supra*, and cases cited therein.

When weighed against this standard, the trial court's decision to deny the motion for judgment of acquittal was proper. The question of Ms. Starr's credibility was for the jury to determine. If believed, her testimony, together with the circumstantial evidence, was clearly sufficient to make out a prima facie case against defendant.

## IV.

### Was There Sufficient Cause To Stop Defendant.

Defendant contends that Chief of Police Larson did not have sufficient cause to stop defendant and that therefore any information obtained as a result of the illegal stop was inadmissible at defendant's trial.

In *State v. Burkman*, 281 N.W.2d 436 (S.D.1979), we held that it is proper for a police officer to question persons when the circumstances reasonably indicate that

such questioning is necessary to the proper discharge of the officer's official duties. We also held that "[a] police officer has both the right and duty to make a reasonable investigation of suspicious activities even though the nature of the activities may fall short of grounds sufficient to justify an arrest or a search." *Id.* at 439. We followed this holding in *State v. Soft,* 329 N.W.2d 128 (S.D.1983), and in *State v. Clabaugh,* 346 N.W.2d 448 (S.D.1984).

■ When measured against the *Burkman* test, Officer Larson's investigatory stop of defendant was reasonable under the circumstances. Defendant was seen approaching the burglarized building through an alley within a relatively short time after the entry had been made. From the fact that the burglar had placed the targeted personal property near the point of entry, had placed a suitcase and a flashlight in a convenient location, and had apparently stanched an entry-inflicted wound near the point of his exit from the building, Officer Larson could reasonably conclude that whoever had entered the building would return to the scene to reap the fruits of his entry. Accordingly, we hold that the investigatory stop of defendant was reasonable under the circumstances.

■ Having properly stopped defendant for questioning, Officer Larson was well within his rights in asking defendant for identification and in requiring him to display his hands for evidence of recent wounds. The evidence resulting from Officer Larson's questioning and request for an inspection of defendant's hands revealed probable cause for arresting defendant and searching his clothes as an incident to that arrest. *State v. Burkman, supra; Terry v. Ohio,* 392 U.S. 1, 88 S.Ct. 1868, 20 L.Ed.2d 889 (1968).

## V.

### Prosecutorial Misconduct.

We come, then, to the most troublesome issue raised by this appeal. During his direct examination of Ms. Starr, the state's attorney asked her to identify the brown corduroy coat that was found beneath the trailer that was parked near the Trading Post. As indicated above, Ms. Starr testified that defendant was wearing the coat on the night of November 18 and the morning of November 19, 1983. During his cross-examination, defense counsel asked Ms. Starr, "Do you recall whether or not Kevin wore a coat?" Ms. Starr replied, "Yes, he wore a coat that night." Defense counsel then moved on to other matters. On redirect examination, the state's attorney asked the following questions of Ms. Starr and received the following answers:

Q. Your friend, Kevin Dirk, wore this corduroy coat, Exhibit 7, quite a bit, didn't he?

A. Yes.

Q. Was he wearing it that night when you went to the movie?

A. Yes, he was.

Q. How do you remember that?

A. Because we stole some wine at the liquor store with it.

Q. Doesn't it have some ripped out spots where you can hide wine in it?

A. Yes.

Q. That is why it is ripped out?

A. Yes.

MR. DEWELL: That's all I'd have. Thank you.

MR. ALLEN: I have no further questions.

After an off-the-record sidebar conference between counsel and the court, the state rested. At an in-chambers conference immediately thereafter, defense counsel moved for a mistrial on the grounds that the state had introduced evidence of another offense, i.e., stealing wine. In denying the motion, the trial court stated in part:

The evidence there was going to come out one way or another had you started your cross-examination on how she knew he was wearing that coat that evening. The testimony is relevant to the extent that she is specific in her memory as to Mr. Dirk wearing the coat in question as she stated the reason why. It does have

the nature of also placing with it the connotation that you directed yourself to, Mr. Allen, and that is portraying an image of Mr. Dirk, an overall image that may or may not be a proper issue in the case.

At the conclusion of the in-chambers conference, which lasted some fifty minutes, the trial court reconvened the proceedings and stated to the jury:

[J]ust prior to the recess and during the testimony presented by Catherine Starr, there was reference made to actions attributed to Mr. Dirk and Ms. Starr that indicated that the defendant may have been involved in an alleged offense of petty theft. I instruct you specifically at this time that you must disregard that statement by her or any of its implications. As you know, the defendant is charged here today with the offense of third degree burglary that involves the Pioneer Trading Post, and your deliberations are limited to the evidence and the testimony that has been presented on that issue.

In addition to this verbal admonition to the jury, the trial court gave the following written instruction to the jury:

A WITNESS, CATHERINE STARR, HAS TESTIFIED THAT SHE AND THE DEFENDANT MAY HAVE BEEN INVOLVED IN AN ALLEGED OFFENSE OF PETTY THEFT. YOU ARE INSTRUCTED THAT YOU MUST DISREGARD THAT STATEMENT AND ANY OF ITS IMPLICATIONS. THE DEFENDANT IS CHARGED WITH THIRD DEGREE BURGLARY, INVOLVING THE PIONEER TRADING POST. YOUR DELIBERATIONS ARE LIMITED TO THE EVIDENCE AND TESTIMONY PRESENTED ON THAT ISSUE.

We agree with defendant that the testimony regarding the theft of the wine was not admissible for any of the purposes set forth in SDCL 19–12–5, which is our rule of evidence governing the admission of evidence of other crimes, wrongs, or acts. Likewise, we find inexplicable the trial court's comment that this testimony would have come out had defense counsel started his cross-examination on how Ms. Starr knew that defendant had been wearing that coat that evening. The simple fact is that defense counsel had already concluded his cross-examination of Ms. Starr and had asked only one rather innocuous question concerning the coat. Accordingly, the state's attorney's questions on redirect cannot be interpreted as a fair attempt to rehabilitate Ms. Starr's testimony with respect to the fact that defendant was wearing the coat on the night and early morning in question. In a word, we are satisfied that the state's attorney deliberately injected this prejudicial testimony knowing full well that there was no rational theory to support its admissibility.

The question remains whether this prosecutorial misconduct was so prejudicial that it could not reasonably be said to have been cured by the trial court's verbal and written instructions to the jury.

Before deciding that issue, we must note that defense counsel did not object to the challenged questions or move to strike the answers thereto.* In *State v. Big Head,* 363 N.W.2d 556 (S.D.1985), we held that defense counsel's failure to object at the time questions were asked constituted a waiver of defendant's right to later object to the testimony received in response to those questions. *See also State v. Gage,* 302 N.W.2d 793 (S.D.1981); *State v. Kidd,* 286 N.W.2d 120 (S.D.1979); and *State v. Kindvall,* 86 S.D. 91, 191 N.W.2d 289 (1971). As these cases point out, the requirement of a prompt objection to the propriety of a state's attorney's actions is to ensure that the trial court is given a fair opportunity to remedy the impropriety by striking the challenged testimony, promptly admonishing the jury, or taking whatever other action that may be appropriate in the circumstances.

Under the authority of our holding in *Big Head, supra,* we could hold that defendant

* We note that defendant's counsel on appeal did not represent him at trial.

waived his objections to the challenged testimony by reason of his failure to object to the questions and to move to strike the answers. We prefer not to rest our holding on that ground, however, inasmuch as we are satisfied that in this case, as contrasted to the situation that we were presented with in *State v. Gage, supra,* the objectionable questions and the answers thereto were not so highly prejudicial that the trial court's verbal and written cautionary instructions were perforce inefficacious. Stated another way, we conclude that after giving due deference to the trial court's on-the-scene opportunity to judge the tenor and impact of the challenged questions and answers, the trial court did not commit reversible error in refusing to grant a mistrial and in determining that the cautionary instructions were adequate to cure any prejudice that otherwise might have resulted therefrom. *State v. Kidd, supra; State v. Havens,* 264 N.W.2d 918 (S.D.1978).

The judgment of conviction is affirmed.

FOSHEIM, C.J., MORGAN, J., and WUEST, Acting as Supreme Court Justice, concur.

HENDERSON, J., concurs in result.

HENDERSON, Justice (concurring in result).

I wish only to write on the prosecutorial misconduct issue in this case. *See State v. Big Head,* 363 N.W.2d 556, 564 (S.D.1985) (Henderson, J., specially concurring), on the subject of prosecutorial misconduct. This author has consistently taken a position on action which must be taken by defense counsel when there is prosecutorial misconduct. *See State v. Kidd,* 286 N.W.2d 120, 123 (S.D.1979) (Henderson, J., concurring specially) (citing *State v. Christiansen,* 46 S.D. 61, 67, 190 N.W. 777, 779 (1922)); for civil application, *see Schlagel v. Sokota Hybrid Producers,* 279 N.W.2d 431, 434 (S.D.1979) (Henderson, J., concurring specially). Here, defense counsel made no timely objection. Defense counsel did make a motion for mistrial in chambers and did obtain a verbal admonition to the jury and a written instruction to the jury

by the trial judge. On-the-spot corrections, in front of the jury, are powerful. These are prompted and triggered by an immediate objection by defense counsel. True, a prosecutor ought to know better, but a defense lawyer ought to also forthwith protect his client in the presence of the jury. If a question is asked so quickly and answered by the witness so quickly that an objection cannot be inserted between the question and the answer, defense counsel should make a motion to strike the answer and then object to the question. Following the procedure I have consistently outlined, will permit a trial judge to correct a factual or ethical impropriety at once. This is not the first time we have seen this zeal emanating from the prosecutor's office in Fall River County. The zeal in this record takes on the character of prosecutorial misconduct. I do not condone either the coat testimony elicited nor testimony regarding another possible crime or crimes. I do wish to state that certain conduct before the jury by a prosecutor can be so highly improper and highly prejudicial that no immediate action taken by defense counsel can cure it. A flagrant prosecutorial act, in the presence of the jury, can rise to such dimension that a fair trial cannot be had even if an instruction to disregard the conduct or questioning is placed before the jury by the presiding judge. When this Court is faced with such a situation, we should call a foul—a foul—and reverse.