**STATE of South Dakota, Plaintiff and Appellee,**

v.

**Roscoe PRIMEAUX, Defendant and Appellant.**

No. 13692.

Supreme Court of South Dakota.

Considered on Briefs Nov. 19, 1982.

Decided Dec. 28, 1982.

Grant E. Gormley, Asst. Atty. Gen., Pierre, S.D., for plaintiff and appellee; Mark V. Meierhenry, Atty. Gen., Pierre, S.D., on brief.

Owen R. Wipf of Wipf & Cotton, Wagner, S.D., for defendant and appellant.

DUNN, Justice.

This is an appeal from a judgment of conviction for one count of second-degree murder pursuant to SDCL 22–16–7 and two counts of aggravated assault pursuant to SDCL 22–18–1.1(1). We affirm.

During the evening of October 14, 1981, and in the early morning hours of October 15, 1981, there was a party in Melvin Cournoyer's (Melvin) trailer house in Wagner, South Dakota. The participants included Lydia Picotte (Lydia), Debbie Plenty Horse (Debbie), Rodney Provost (decedent), Fred Kazena, Jr. (Fred), and Melvin. Also in the trailer were five young children. Some of the participants had been drinking heavily throughout the evening.

During the festivities, a series of fights erupted. Although there is some dispute as to the order of events, it appears that Fred and the decedent first got into a dispute over decedent's identification card. Decedent struck Fred and threw him out of the trailer. Soon after, Lydia and Debbie got into a dispute and began fighting in the kitchen. While this fight was going on, Roscoe Primeaux (appellant) approached the trailer and knocked on the door. As appellant approached, he saw Fred, who was evidently passed out, on the porch steps. Decedent opened the door and, for no apparent reason, struck appellant, sending him backwards off the porch and onto a car parked next to the trailer. When he came to, appellant again walked up the stairs and around Fred and knocked on the trailer door. The fight between the women had ended and decedent allowed appellant to enter the trailer house.

At this point, it was well after 1:00 a.m. in the morning of October 15. Appellant, like several of the others, had also been drinking throughout the prior afternoon and evening. Upon being admitted to the trailer, appellant was offered a beer. He accepted it and joined the party.

Soon after, another fight broke out; this time between Debbie and decedent. The two were fighting on the floor when Lydia tried to break up the altercation. As Lydia was leaning over the two, she felt something on her back (not realizing she had been stabbed). As Lydia stood up, she saw appellant with a knife and he stabbed her again, this time underneath her arm. Lydia moved out of the way and sat down in an armchair.

Several participants testified that appellant then stabbed decedent numerous times while decedent was on the floor. At some point, Melvin was also stabbed but he was so intoxicated he did not realize it. Thereafter, Fred, who had been passed out on the steps leading to the trailer door, knocked on the door. Appellant opened the door, stabbed Fred, pulled him into the trailer, stabbed him again, and then pushed him in the general direction of the others. All this noise awakened Lydia's baby and it began to cry. Appellant apparently threatened to kill the baby if it did not stop crying. Soon after, appellant ran out of the trailer.

Immediately thereafter, Lydia and Debbie ran to the trailer court owner's residence, woke her, and had her summon the police and ambulance service. The police arrived at approximately 5:35 a.m. All the participants were taken to a local hospital and treated. An autopsy performed on decedent revealed fifteen significant stab wounds, a variety of abrasions and contusions and some superficial lacerations on one arm.

At approximately 7:00 a.m., appellant was arrested at a housing development in Wagner, South Dakota. His hands, trousers and boots were covered with blood. A blood sample was taken from appellant around 9:40 a.m. to determine his blood alcohol content. It tested at .13% by weight.

At trial, the jury convicted appellant of the second-degree murder of decedent and aggravated assault of Lydia and Fred. Appellant received life imprisonment for the second-degree murder conviction pursuant

to SDCL 22–6–1(2). This sentence makes appellant ineligible for parole. SDCL 24–15–4, although the life sentence may be commuted. SDCL 24–14–1; 24–14–5. The two aggravated assault charges resulted in four and six-year terms respectively. Both sentences are to run concurrent with the life sentence. Appellant now appeals his conviction.

■ Appellant first contends the second-degree murder statute found at SDCL 22–16–7 [1] is unconstitutionally vague. Appellant presents two theories to support his contention. First, appellant argues the language in SDCL 22–16–7 is not susceptible to accurate definition and, second, appellant argues the language in the statute defines criminal behavior which is easily confused with SDCL 22–16–15(3) which defines first-degree manslaughter.[2] We address each theory in turn.

We do not believe, as appellant contends, that the phrase "any act imminently dangerous to others and evincing a depraved mind" is subject to uneven application and interpretation. The jury was given the following instruction by the trial court to define the phrase:

The phrase "evincing a depraved mind regardless of human life" means a person who is indifferent to the life of others, that is, a person who not only disregards the safety of another but is devoid of regard for the life of another.

The phrase "imminently dangerous act" means an act which is inherently dangerous which puts the lives of others in jeopardy.

We note other jurisdictions with similar statutory schemes have used this type of definition. *Marasa v. State,* 394 So.2d 544 (Fla.App.1981); *Wagner v. State,* 76 Wis.2d 30, 250 N.W.2d 331 (1977); *Seidler v. State,* 64 Wis.2d 456, 219 N.W.2d 320 (1974).

In *State v. Bad Heart Bull,* 257 N.W.2d 715 (S.D.1977), this court discussed the test for statutory vagueness in criminal statutes. We stated:

A crime must be statutorily defined with definiteness and certainty. A statute which either forbids or requires the doing of an act in terms so vague that men of common intelligence must necessarily guess at its meaning and differ as to its application violates the first essential of due process. A criminal statute must give a person of ordinary intelligence fair notice that his contemplated conduct is forbidden.

*Id.* at 720 (citations omitted); *State v. Havens,* 264 N.W.2d 918 (S.D.1978); *State v. Martin,* 85 S.D. 587, 187 N.W.2d 576 (1971). We believe SDCL 22–16–7 does give fair notice of what conduct is forbidden and we accordingly reject appellant's assertion that the statute is unconstitutionally vague.

Appellant's other theory alleges there is confusion as to the difference between first-degree manslaughter and second-degree murder. We do not agree. The crucial distinction between second-degree murder and manslaughter in the first degree is that the former requires a "depraved mind" as an element of the crime, while the latter does not. As the State points out, the "depraved mind" requirement is a genuine additional element which must be established in order to prosecute for second-degree murder. *Hagenkord v. State,* 100 Wis.2d 452, 302 N.W.2d 421 (1981).

1. SDCL 22–16–7 provides:

Homicide is murder in the second degree when perpetrated by any act imminently dangerous to others and evincing a depraved mind, regardless of human life, although without any premeditated design to effect the death of any particular individual.

2. SDCL 22–16–15 provides:

Homicide is manslaughter in the first degree when perpetrated:

(1) Without a design to effect death by a person while engaged in the commission of a misdemeanor involving moral turpitude;

(2) Without a design to effect death, and in a heat of passion, but in a cruel and unusual manner;

(3) Without a design to effect death, but by means of a dangerous weapon;

(4) Unnecessarily, either while resisting an attempt by the person killed to commit a crime or after such attempt shall have failed. Manslaughter in the first degree is a Class 1 felony.

Appellant next contends the trial court erred in failing to instruct the jury on diminished capacity due to intoxication on the second-degree murder charge. This court has stated that voluntary intoxication can be a consideration by the jury in determining whether a defendant possessed the necessary specific mens rea. *State v. Kills Small,* 269 N.W.2d 771 (S.D.1978). We have also stated, however, that voluntary intoxication is not a defense to general criminal intent crimes. *State v. Plenty Horse,* 85 S.D. 401, 184 N.W.2d 654 (1971).

In *State v. Rash,* 294 N.W.2d 416 (S.D. 1980), we discussed the distinction between specific intent crimes and general intent crimes. We concluded:

[S]pecific intent crimes would be limited only to those crimes which are required to be committed either purposefully or knowingly, while general intent crimes would encompass those crimes which can be committed either recklessly or negligently. Thus, in order to commit a specific intent crime, an offender would have to subjectively desire or know that the prohibited result will occur, whereas in a general intent crime, the prohibited result need only be reasonably expected to follow from the offender's voluntary act, irrespective of any subjective desire to have accomplished such result.

*Id.* at 417, quoting from *People v. Lerma,* 66 Mich.App. 566, 239 N.W.2d 424 (1976). While we have noted this distinction, we have not addressed the precise issue of whether our second-degree murder statute is a specific or general intent statute. We believe the "depraved mind" requirement of our second-degree murder statute requires only the general intent to do the acts which caused the harm, but not the specific intent to do the harm. *Hagenkord v. State, supra.* Since we conclude second-degree murder under SDCL 22–16–7 is a general intent crime, we agree with the trial court's determination that the voluntary intoxication diminished capacity instruction was not proper.

Appellant also argues that the statutory scheme of SDCL 22–6–1, which re-quires life imprisonment for Class B felonies and precludes any possibility for parole, SDCL 24–15–4, shocks the conscience of the community and constitutes cruel and unusual punishment.

In *State v. Curtis,* 298 N.W.2d 807 (S.D. 1980), we noted that:

[A] sentence within statutory limits is not reviewable on appeal. We have also stated, however, that a sentence may be constitutionally offensive if its duration is so excessive as to shock the conscience.

*Id.* at 811 (citations omitted).

We do not believe that the mandatory imposition of life sentences without parole for crimes constituting second-degree murder is so cruel and unusual as to shock the conscience of the court. Moreover, in this case, the punishment is certainly not disproportionate to the crime committed.

Since we affirm the second-degree murder conviction which results in a life sentence with no possibility of parole, we see no reason to review the aggravated assault convictions.

The judgment of conviction is affirmed.

All the Justices concur.