1998 SD 93

**STATE of South Dakota, Plaintiff and Appellee,**

v.

**William HART, Defendant and Appellant.**

**No. 20238.**

Supreme Court of South Dakota.

Considered on Briefs June 3, 1998.

Decided Aug. 12, 1998.

Mark Barnett, Attorney General, Grant Gormley, Assistant Attorney General, Pierre, for plaintiff and appellee.

Michael Stonefield, Pennington County Public Defender's Office, Rapid City, for defendant and appellant.

MILLER, Chief Justice.

[¶ 1.] William Hart appeals his conviction for second-degree murder. We affirm.

## FACTS

[¶ 2.] On March 1, 1997, Craig Chips was found dead in an apartment in Rapid City, South Dakota, with a stab wound to his chest. An autopsy revealed that Chips died from that wound. Hart was later convicted of the second-degree murder of Chips.

[¶ 3.] About six months earlier, Hart's wife, Olivia, had a sexual relationship with Chips. Hart, who was aware of this affair, became upset and angry.

[¶ 4.] A couple of days before the murder, on February 27, 1997, Olivia found Hart with another woman in a Rapid City motel. She became angry, struck him, and told him she wanted a divorce. She then apparently went to be with Chips.

[¶ 5.] Two days later, Hart had a friend drive him to where Chips was staying. Hart had taken two knives along with him.[1] Chips was inside the apartment apparently intoxicated and had been sleeping on a couch. Hart was asking him questions about Olivia and had at least one of the knives in his hands. There was trial testimony that Hart then stabbed Chips, although Hart maintains that Chips "moved into" the knife as he got up from the couch.

[¶ 6.] Hart returned to his friend's vehicle and stated that he "did something stupid" and may have stabbed someone in the chest. There was also testimony that he later made statements that he "shanked"[2] someone, and that he had told Olivia that he "took care of" Chips and he "won't be coming back, Baby."

[¶ 7.] Hart was charged with alternative counts of first-degree and second-degree murder. A jury found him guilty of second-degree murder and he was given a sentence of life imprisonment without parole. Hart appeals, raising the following issues:

1. Whether the trial court's jury instructions on second-degree murder were in error.

2. Whether the trial court erred in allowing certain photographs into evidence.

3. Whether the trial court erred in not allowing Hart to impeach

the testimony of two of the State's witnesses.

4. Whether the trial court improperly allowed testimony regarding Hart's character.

## DECISION

[¶ 8.] **1. The trial court's jury instructions on second-degree murder were not in error.**

■ [¶ 9.] Hart alleges the trial court erred in giving a jury instruction defining an element of second-degree murder. He claims his proposed instruction, and not the one used by the trial court, accurately defines the term "depraved mind" under South Dakota law.

[¶ 10.] SDCL 22–16–7 defines second-degree murder as: "Homicide is murder in the second degree when perpetrated by any act imminently dangerous to others and evincing a depraved mind, regardless of human life, although without any premeditated design to effect the death of any particular individual." Over Hart's objection, the trial court opted to use South Dakota Criminal Pattern Jury Instruction 3–24–13, to define the terms found in the second-degree murder statute. The trial court instructed:

The word "imminent" or any derivative thereof as used in these instructions means near at hand; mediate rather than immediate; close rather than touching; impending; on the point of happening; threatening; menacing; perilous.

The phrase "dangerous to others" as used in these instructions means an act which is inherently dangerous which puts the lives of others in jeopardy.

*The phrase "evincing a depraved mind, regardless of human life" as used in these instructions means conduct demonstrating an indifference to the life of others,*

---

1. Hart claims he took the knives for protection based on his knowledge of Chips.

2. To "shank" means "to cut (a person) deeply with a knife." Webster's Third New International Dictionary 2087 (1976).

*that is not only disregard for the safety of another but a lack of regard for the life of another.*

(Emphasis added.) Hart has only objected to the italicized portion pertaining to the definition of "depraved mind."

[¶ 11.] Hart had proposed his own definition of "evincing a depraved mind," which read: " 'Evincing a depraved mind, regardless of human life,' means conduct demonstrating an utterly corrupt, perverted, or immoral state of mind at the time of the offense. A depraved mind is a state of mind containing the highest grade of malice." Hart claims the trial court refusal of this definition was error.

[¶ 12.] Hart first argues the definition used by the trial court was erroneous because it conflicts with South Dakota's homicide statutory scheme. Specifically, he argues that the trial court's definition is repugnant to the first-degree manslaughter statute found at SDCL 22–16–15(2). That statute provides:

Homicide is manslaughter in the first degree when perpetrated:

(1) Without a design to effect death by a person while engaged in the commission of a misdemeanor involving moral turpitude;

(2) Without a design to effect death, and in a heat of passion, but in a cruel and unusual manner;

(3) Without a design to effect death, but by means of a dangerous weapon;

(4) Unnecessarily, either while resisting an attempt by the person killed to commit a crime or after such attempt shall have failed;

(5) Unnecessarily, either while resisting an attempt by a pregnant woman to either commit a crime or after such attempt shall have failed....

Hart focuses on subsection 2 and the phrase "cruel and unusual manner."

[¶ 13.] South Dakota Criminal Pattern Jury Instruction 3–24–27 defines "cruel and unusual manner" as follows:

"In a cruel and unusual manner" means the killing was done with some excess of cruelty or refinement or unusual cruelty under the circumstances sufficiently marked to approach barbarity and to make it especially shocking, and the unusual character of the manner displayed in the killing must stand out as sufficiently unusual and unique or peculiar as to astonish and shock persons of normal sensibilities.

[¶ 14.] Hart contends that the definitions for "evincing a depraved mind" and "in a cruel and unusual manner" are inconsistent. He maintains that, under the definition used by the trial court for "evincing a depraved mind," it appears second-degree murder is a less egregious or less culpable crime than first-degree manslaughter. He argues that a killing "demonstrating an indifference to life" is simply not as bad as a killing done in a manner that is "especially shocking" or "approach[ing] barbarity." Hart cites to *State v. Primeaux*, 328 N.W.2d 256, 258 (S.D.1982), wherein we held that "[t]he crucial distinction between second-degree murder and manslaughter in the first degree is that the former requires a 'depraved mind' as an element of the crime, while the latter does not." He argues that, since the phrase "depraved mind" is the crucial distinction, it should be defined in a way that "sounds worse" than "in a cruel and unusual manner."

[¶ 15.] We find no merit in Hart's argument. It is true that "evincing a depraved mind" is the critical distinction between second-degree murder and first-degree manslaughter; however, Hart's argument only focuses on one phrase in one subsection of the first-degree manslaughter statute. Subsection 2, that Hart emphasizes, would pertain to a situation where an individual would not be guilty of murder, even though the killing was done in a "barbaric" manner, because that person was acting in the "heat of passion." "Heat of passion" is defined as an "intent 'formed suddenly, under the influence of some violent emotion, which for the instant overwhelmed the reason of the slayer.' " *Graham v. State*, 346 N.W.2d 433, 434 (S.D.1984) (citing *State v. Edmunds*, 20 S.D. 135, 140, 104 N.W. 1115, 1116 (1905)); *see also* South Dakota Criminal Pattern Jury Instruction 3–24–26 defining the phrase as:

" 'Heat of passion' is such mental disturbance or condition as would so overcome and dominate or suspend the exercise of the judgment of [a person] as to render [that person's] mind for the time being deaf to the voice of reason, make [him or

her] incapable of forming and executing the distinct intent to take human life, and to cause [him or her], *uncontrollably,* to act from impending force of the disturbing cause *rather than from any real wickedness of heart* or cruelty or recklessness of disposition." (Emphasis added.)

[¶ 16.] Therefore, while at first blush it may sound worse to kill someone in a "barbaric manner," the distinction is that for first-degree manslaughter, the killing must be "in the heat of passion," and the perpetrator must be unable to control his or her actions. The heat of passion acts as a mitigating factor, rather than an excuse, for the homicide. It is apparent that, when looking at the second-degree murder and first-degree manslaughter statutes as a whole, the definition employed by the trial court is not inconsistent with our homicide statutory scheme. If a person is able to act with "a lack of regard for the life of another," then that person can be convicted of second-degree murder.

[¶ 17.] Hart's second argument focuses on the fact that the term "depravity of mind" is an aggravating circumstance listed in SDCL 23A–27A–1 which can lead to the imposition of the death penalty in a first-degree murder case. That term has been defined differently in that context. In *State v. Rhines*, 1996 SD 55, ¶ 148, 548 N.W.2d 415, 449, we held that the trial court's definition of "depravity of mind" as an aggravating circumstance to justify imposition of the death penalty was unconstitutional as violative of the South Dakota Constitution and the Eighth and Fourteenth Amendments to the United States Constitution.[3] In *Rhines*, we noted:

"A State's definitions of its aggravating circumstances—those circumstances that make a criminal defendant 'eligible' for the death penalty—therefore play a significant role in channeling the sentencer's discretion." *Lewis v. Jeffers*, 497 U.S. 764, 774, 110 S.Ct. 3092, 3099, 111 L.Ed.2d 606, 619 (1990). To satisfy constitutional mandates, an aggravating circumstance must meet two basic requirements. First, it "must genuinely narrow the class of persons eligible for the death penalty and must reasonably justify the imposition of a more severe sentence on the defendant compared to others found guilty of murder." *Zant v. Stephens*, 462 U.S. 862, 877, 103 S.Ct. 2733, 2742, 77 L.Ed.2d 235, 249–50 (1983). Second, "the aggravating circumstance may not be unconstitutionally vague." *Tuilaepa v. California*, 512 U.S. 967, 972, 114 S.Ct. 2630, 2635, 129 L.Ed.2d 750, 759 (1994). A challenged provision is impermissibly vague when it fails to adequately inform juries what they must find to impose the death penalty and as a result leaves them and appellate courts with open-ended discretion. *Maynard v. Cartwright*, 486 U.S. 356, 361–62, 108 S.Ct. 1853, 1858, 100 L.Ed.2d 372, 380 (1988).

1996 SD 55, ¶ 139, 548 N.W.2d at 447.

[¶ 18.] In *Primeaux*, we held that SDCL 22–16–7, our second-degree murder statute, was not unconstitutionally vague. 328 N.W.2d at 258. There, we looked to see if the statute "give[s] a person of ordinary in-

---

**3.** In *Rhines*, the trial court defined "depravity of mind" as:

"Depravity of mind is a reflection of an utterly corrupt, perverted, or immoral state of mind *at the time of the murder.* In determining whether the offense of First Degree Murder in this case involved depravity of mind on the part of the Defendant, you may consider the age and physical characteristics of the victim and you may consider the actions of the defendant prior to, *during* and after the commission of the murder. In order to find that the offense of First Degree Murder involved depravity of mind, you must find that the Defendant, as a result of utter corruption, perversion, or immorality, committed torture upon the living victim; or subjected the body of the deceased victim to mutilation or serious disfigurement;

*or relished the murder; or inflicted gratuitous violence upon the victim; or the senselessness of the crime; or the helplessness of the victim. If acts occurring after the death of the victim are relied upon by the state to show depravity of mind of the Defendant, such acts must be shown to have occurred so close to the time of the victim's death, and must have been of such a nature, that the inference can be drawn beyond a reasonable doubt that the depraved state of mind of the murderer existed at the time the fatal blows were inflicted upon the victim."* 1996 SD 55, ¶ 141, 548 N.W.2d at 447–48 (emphasis in original). Rhines had only objected to the italicized portion of the instruction, and it is from the non-italicized portion that Hart derived his proposed instruction for "depraved mind" in the present case.

telligence fair notice that his contemplated conduct is forbidden." *Id.* We held that it did, and also focused on the trial court's definition of "depraved mind," which was almost identical to the one employed in the present case. *Id.* On the other hand, an aggravating circumstance in death penalty cases must meet a stricter constitutional test as outlined above. We agree with the State's assertion that Hart's argument is like "comparing apples and oranges." Hart has presented no real authority why the two definitions cannot be different, and we never gave any indication in *Rhines* that the definition we approved in *Primeaux* was no longer appropriate.[4]

#### [¶ 19.] 2. The trial court did not err in allowing certain photographs into evidence.

■ [¶ 20.] At trial, the State submitted sixteen photographs to the court which it wanted admitted as evidence. Hart objected to six of them and the court ultimately allowed five of those six into evidence. Hart now claims on appeal that admission of four of those photographs was error. We do not agree.

■ [¶ 21.] Our standard of review for this issue is whether the trial court abused its discretion. *State v. Knecht*, 1997 SD 53, ¶ 7, 563 N.W.2d 413, 417. Photographs are admissible "(1) when they portray anything that a witness may describe, and (2) when they assist in a verbal description of objects or conditions *and* are relevant to some material issue." *State v. Muetze*, 368 N.W.2d 575, 586 (S.D.1985) (citation omitted) (emphasis in original).

[¶ 22.] The trial court examined all of the photographs and made specific findings as to each. Photograph # 8 depicts Chips' body at the crime scene, and the court ruled it was relevant to aid the witnesses in testifying as to the condition of how the body was found at the crime scene. Photograph # 13 is an

autopsy photo of Chips and was admitted as relevant in depicting Chips' body at the time Dr. Habbe performed the autopsy. Photograph # 14 depicts Chips facedown on an autopsy table, and was admitted to aid Dr. Habbe in his testimony. Finally, photograph # 16 is a picture of Chips' heart removed from his body, and was admitted to assist Dr. Habbe in his testimony as to the nature and location of the wound.

■ [¶ 23.] We cannot say the trial court abused its discretion. Photographs can be admitted even if "somewhat gruesome, cumulative, or capable of arousing passion or prejudice in the jury." *State v. Simons*, 313 N.W.2d 465, 469 (S.D.1981) (collecting cases). The photographs were properly admitted to help aid witnesses in their testimony and were relevant.

#### [¶ 24.] 3. The trial court did not err in not allowing Hart to impeach the testimony of two of the State's witnesses.

■ [¶ 25.] Hart also argues that the trial court erred in not allowing him to impeach two of the State's witnesses. Specifically, he claims that these two witnesses were allowed to testify as to Chips' character when drunk, and he wanted to "impeach" them by putting into evidence files involving criminal charges against Chips when he had been drunk in the past.[5] We must look to see if the trial court abused its discretion in not allowing Hart to present this evidence. *See State v. Latham*, 519 N.W.2d 68, 71 (S.D.1994).

[¶ 26.] Hart argues that, since the State "opened the door" and let in evidence of Chips' character when drunk, he should be allowed to impeach the State's witnesses with instances of specific conduct. Hart relies on SDCL 19-14-8 which provides: "The credibility of a witness may be attacked by any party, including the party calling him." Hart further relies on *State v. Byrum*, 399 N.W.2d 334 (S.D.1987), as a case where instances of

---

4. We also must note that the definition for "depraved mind" which the trial court used in this case is similar to that used in other states. See, e.g., *Marasa v. State*, 394 So.2d 544, 545 (Fla. Dist.Ct.App.) *rev. denied*, 402 So.2d 613 (Fla. 1981); *see also* Black's Law Dictionary 440 (6thEd. 1990) (defining "depraved mind" and noting that "[a]s required for conviction of sec-

ond-degree murder, is one which is indifferent to the life of others.").

5. One file contained an allegation that Chips, while drunk, assaulted a girl friend. The other file contained an allegation that Chips had broken windows on a house and car when drunk.

specific conduct were allowed to impeach a defendant under SDCL 19–14–8. We held in *Byrum*, however, that instances of specific conduct cannot normally be proved by extrinsic evidence. 399 N.W.2d at 337. In *Byrum* the specific conduct was allowed into evidence as impeachment by contradiction, because a defendant had stated that he would never perform a specific act, which it was shown by the evidence that he had. *Id.* at 337–38.

■ [¶ 27.] This is not a case involving impeachment by contradiction. The specific instances of conduct did not involve the witnesses who testified, but were about Chips. This was an attempt by Hart to elicit improper character testimony concerning the victim in this case. An accused may offer a pertinent trait of character of a victim under SDCL 19–12–4(2), and this is generally done through testimony about the victim's reputation. *Latham*, 519 N.W.2d at 71.[6] Hart was allowed to call a witness to testify that Chips had a reputation for violence when drunk. We find no abuse of discretion.[7]

[¶ 28.] Affirmed.

[¶ 29.] AMUNDSON, KONENKAMP, and GILBERTSON, JJ., concur.

[¶ 30.] SABERS, J., dissents.

SABERS, Justice (dissenting).

[¶ 31.] I dissent. The trial court made two improper rulings by allowing inadmissible character evidence which painted Hart as a mean, tough drunk and Chips as a peaceable, innocuous man. The trial court compounded these errors by improperly refusing to allow

Hart to impeach and counter the unfair and prejudicial testimony with evidence of Chips' violent history. We should reverse and remand for a new trial.

[¶ 32.] The evidence erroneously admitted came in through the testimony of two witnesses during State's case-in-chief. The State's Attorney asked Olivia Hart, Defendant's wife, who she thought was the "tougher of the two" between the victim and Hart. Defense counsel timely objected; the objection was overruled and Olivia answered, "I'd say Hart." Later, the court allowed, over defense counsel's timely objection, the following testimony from Beverly Brown:

Q: What are your observations as to [Hart's] temper?

[Objection raised and overruled; question repeated]

A. Well, sometimes he's mean.

. . .

Q. When does that usually happen?

A. When he is drunk.

. . .

Q. Now, you stated for Mr. Hart [that] he gets mean when he has been drinking. Is that the same case for Mr. Chips?

A. No.... He is still quiet.

[¶ 33.] The majority opinion does not address this issue, but instead unfairly and inaccurately characterizes the situation as one falling under the doctrine of "invited error." *See supra* n.6. I agree with the majority opinion that this was error, but it was certainly not invited by Hart.

6. This is not a case that falls under SDCL 19–12–7, which allows specific instances of conduct to be admitted when a character trait of a person is an essential element of a "charge, claim, or defense[.]" Hart even concedes that the evidence was to be used for impeachment, and not for self-defense.

7. We also do not address Hart's final argument, that the trial court allowed improper character testimony concerning him or Chips. We find some of his arguments lacking in merit, and the rest of the testimony falls under the doctrine of invited error. See *State v. Buller*, 484 N.W.2d 883, 888 (S.D.1992) (holding that " '[A] party to a criminal proceeding will not be permitted to allege an error in proceedings in the trial court in which he himself acquiesced, or which was

invited or induced by him.' " (citations omitted)). Despite the dissent's assertion, we are in no way overruling our decision in *Black v. Class*, 1997 SD 22, 560 N.W.2d 544. *Black* is easily distinguishable because in that case "Black had not presented any evidence *nor had his defense counsel made an opening statement*" that "invited" the state to present character evidence of the victim. 1997 SD 22, ¶ 20, 560 N.W.2d at 549 (emphasis added). Also, any assertion that *Black* is overruled because Hart was not allowed to use Chips' criminal record to impeach witnesses on cross-examination is without merit, because nowhere at trial nor on appeal does Hart argue that he merely wished to "inquire" into specific instances of conduct as permitted by SDCL 19–12–6.

[¶ 34.] Generally, the doctrine of invited error provides that "a party will not be heard to complain on appeal of errors which he himself induced or provoked the court or the opposite party to commit. It has been held that for the doctrine of invited error to apply it is sufficient that the party who on appeal complains of the error has contributed to it." *Taylor Realty Co. v. Haberling*, 365 N.W.2d 870, 873 (S.D.1985) (citation omitted). How can it be stated that Hart "induced," "provoked," or "contributed to" this error when he did not ask the questions and he objected immediately? [8]

[¶ 35.] Hart argues that this character evidence was improperly admitted under SDCL 19–12–4 (Fed.R.Evid. 404(a)), which provides in part:

> Evidence of a person's character or a trait of his character is not admissible for the purpose of proving that he acted in conformity therewith on a particular occasion, except:
>> (1) Evidence of a pertinent trait of his character offered by an accused, or by the prosecution to rebut the same;
>> (2) Evidence of a pertinent trait of character of the victim of the crime offered by an accused, or by the prosecution to rebut the same[.]

The improper evidence was not "offered by [the] accused," nor "by the prosecution to rebut the same," but by the State in its case-in-chief. Hart is correct that the introduction of character evidence is prohibited and inadmissible unless the defense has "opened the door" by first presenting evidence of the victim's bad character or evidence of the defendant's good character. *Black v. Class*, 1997 SD 22, ¶¶ 20–21, 560 N.W.2d 544, 549–50.

[¶ 36.] State responds that the door was opened as to the characters of both Hart and Chips during defense counsel's opening argument. The portion of the defense opening statement which State claims opened the door to State's introduction of evidence of Hart's bad character is as follows:

> The State also made reference in regards to Olivia Hart wanting a divorce. Wanting

to leave William Hart that Thursday night. and what the State doesn't mention is that William and Olivia had arguments like this before, and they had made up. And the evidence will show that two days later Olivia is back to William's hotel room, and to this day they're still married.

State claims, "The presentation of Defendant as one who could forgive unfaithfulness and who could handle the worst threats with equanimity opened the door to the prosecution argument that Defendant was sometimes mean." Nonsense.

[¶ 37.] State's claim that Hart opened the door to character evidence fails miserably. Additionally, it constitutes a mischaracterization of defense counsel's statement; he never stated that Hart was "forgiving" or "equanimous" nor did he even appear to be suggesting as much. In fact, the point he was trying to make is evidenced immediately after the portion cited by State:

> Again, you're going to have to consider if an alleged threat to ... divorce in which they get right back together within two days would serve as grounds for premeditated or [depraved] mind to kill.

[¶ 38.] The United States Supreme Court explains the rationale for prohibiting bad character evidence by State in its case-in-chief as follows:

> Although "propensity evidence" is relevant, the risk that a jury will convict for crimes other than those charged—or that, uncertain of guilt, it will convict anyway because a bad person deserves punishment—creates a prejudicial effect that outweighs ordinary relevance....
>
> Courts that follow the common-law tradition almost unanimously have come to disallow resort by the prosecution to any kind of evidence of a defendant's evil character to establish a probability of his guilt. Not that the law invests the defendant with a presumption of good character, but it simply *closes the whole matter of character, disposition and reputation on the prosecution's case-in-chief.* The state may not show defendant's prior trouble with the

---

**8.** The State did not even attempt to assert the invited error doctrine. It is asserted by the majority opinion here for the first time.

law, specific criminal acts, or ill name among his neighbors, even though such facts might logically be persuasive that he is by propensity a probable perpetrator of the crime. The inquiry is not rejected because character is irrelevant; on the contrary, it is said to weigh too much with the jury and to so overpersuade them as to prejudge one with a bad general record and deny him a fair opportunity to defend against a particular charge. The over-riding policy of excluding such evidence, despite its admitted probative value, is the practical experience that its disallowance tends to prevent confusion of issues, unfair surprise and undue prejudice.

*Old Chief v. United States*, 519 U.S. 172, ——, 117 S.Ct. 644, 650–51, 136 L.Ed.2d 574, 588 (1997) (emphasis added) (citations & internal quotations omitted).

[¶ 39.] State also claims the door was opened to the introduction of evidence of Chips' good character. The portion of the defense opening statement which State claims gave the prosecution the right to show Chips was peaceable when drunk is as follows:

> [Hart had a knife] for his own protection.... Chips received injuries from a fight earlier that day[.] ... I believe the evidence will show that a combination of both that severe head injury and that blood alcohol content would make Craig Chips incapable [of] acting rationally.

[¶ 40.] Defense counsel did not state that Chips was tough or intimidating or make any other insinuation that shed unfavorable light on Chips' character. Counsel stated that Hart carried a knife "out of concern, there may be some trouble, out of concern of not knowing what would take place and who would be there." Furthermore, State takes the "incapable of acting rationally" statement out of context; Hart's argument all along was that Chips was stabbed accidentally when he leaned into the knife as he stood. Defense counsel was trying to persuade the jury that standing and leaning into the knife happened because of Chips' physical and mental imbalance brought about by the beating he took in an earlier, unrelated fight and the large amount of alcohol present in his system.

[¶ 41.] This opening statement was not, by any stretch of imagination, the "opening of the door" requisite to the admission of this character evidence. The majority opinion wholly fails to justify the admission of this improper evidence. *See Black*, 1997 SD 22 at ¶¶ 20–21, 560 N.W.2d at 549–50:

> [T]he State's adducement of evidence of Hymore's character for peacefulness when he was drinking does not fall within the two limited exceptions, available to the prosecution in this case, to the general rule that such evidence is inadmissible. *The State cannot introduce evidence of a victim's good character unless and until the defendant has "opened the door" by first presenting evidence of the victim's bad character.*
>
> . . .
>
> "It is well settled that the prosecution cannot, in the first instance and as part of its evidence in chief, or before the character of the deceased has been attacked by the defense, introduce evidence of the reputation of the deceased for peaceableness or prove that he was a quiet and orderly citizen." 40 Am.Jur.2d *Homicide* § 308 (1968).

(Emphasis added).

[¶ 42.] An additional witness, Cleveland Broken Rope, testified to Chips' good character during State's case-in-chief:

Q: Okay. What kind of a guy is Craig Chips?

A: He is a nice guy. He is real nice.

. . .

Q: Tell the jury why you think Craig was a nice guy.

A: Minds his own business. He don't mess with anybody else. He likes talking to people and no one will bother him.

Q: Was—would Craig be the kind of guy to go looking for a fight?

A: No, never did. It comes to him. He don't go to them. The fights come to him all the time.

[¶ 43.] Hart sought to impeach Brown and Broken Rope by introducing Chips' criminal

record, which showed that he had been charged twice for drunken, violent behavior. In one case, a drunk Chips allegedly assaulted a girlfriend[9] and in the other, Chips broke windows in an automobile and a house while drunk. The majority opinion claims that "[t]his was an attempt by Hart to elicit improper character testimony concerning the victim in this case." *Supra* at ¶ 27. Obviously, Hart sought to impeach the evidence of Chips' good character improperly introduced by the prosecution.

[¶ 44.] The trial court refused to admit specific instances of prior conduct to impeach the witnesses. State claims that defense counsel did not alert the trial court to the basis for his request to admit the evidence of these two convictions. The transcript of the hearing shows that assertion to be incorrect:

[BY DEFENSE COUNSEL]: Now, [Broken Rope and Brown's testimony] is character evidence that we had not anticipated having to deal with in this case. I did not anticipate that there would be any such attempting to vouch for his character, and I don't believe that anything we had done to the point where this first came in addressed directly Craig Chips' character or that he was mean or a bad person when he was drinking or anything to that extent. So essentially what this testimony of these witnesses did was put us in a position where we felt an obligation to attempt to locate on a very short notice ... evidence to the contrary.

. . .

So we have those two additional things here that appear to be evidence which would directly rebut the evidence the State presented. . . .

[THE COURT]: So you're requesting only to put it in to rebut the testimony that you allege that the State has put on showing the victim's good character?

. . .

[THE COURT]: Well, your [theory] of defense is not defensive and victim aggressive; is that correct?

**9.** Although not argued by State at trial or on appeal, this charge was dismissed for lack of probable cause after preliminary hearing and was likely inadmissible. Therefore, the exclusion

[BY DEFENSE COUNSEL]: That's correct. But at the same time they have opened up his peaceful character[.]

[¶ 45.] The court's refusal to admit the police record for impeachment purposes is error under SDCL 19–12–6 (Fed.R.Evid. 405(a)):

In all cases in which evidence of character or a trait of character of a person is admissible, proof may be made by testimony as to reputation or by testimony in the form of an opinion. *On cross-examination, inquiry is allowable into relevant specific instances of conduct.*

(Emphasis added). Hart does not cite this statute, but relies upon SDCL 19–14–8 (Fed. R.Evid. 607) ("The credibility of a witness may be attacked by any party, including the party calling him."). This statute does not foreclose the use of specific instances of Chips' conduct to impeach or contradict the witnesses' character testimony.

[¶ 46.] Furthermore, the trial judge stated that she "carefully reviewed" the following cases as the basis for excluding the evidence: *State v. Knecht*, 1997 SD 53, 563 N.W.2d 413; *Black*, 1997 SD 22, 560 N.W.2d 544; *State v. Latham*, 519 N.W.2d 68 (S.D.1994); *State v. Dokken*, 385 N.W.2d 493 (S.D.1986); and *State v. Padgett*, 291 N.W.2d 796 (S.D.1980). Since SDCL 19–12–6 was discussed in *Knecht* and *Latham* and the principle of impeachment with specific instances of conduct addressed in *Black*, and since defense counsel made it clear that he wished to impeach the inadmissible character evidence, Hart has not waived this argument simply because he relies on the wrong statute in his brief.

[¶ 47.] Even if a majority of the court concluded he waived this argument, we could still examine it under the "plain error" doctrine. SDCL 23A–44–15 (Fed.R.Crim.P. 52(b)) ("Plain errors or defects affecting substantial rights may be noticed although they were not brought to the attention of a court."); cf. *Gordon v. United States*, 344

of the simple assault file could be excused under the "right result, wrong reason" rationale. See, e.g., *Kehn v. Hoeksema*, 524 N.W.2d 879, 881 (S.D.1994).

U.S. 414, 422–23, 73 S.Ct. 369, 375, 97 L.Ed. 447, 455 (1953):

> We believe, moreover, that the combination of these two errors was sufficiently prejudicial to require reversal. The Government, in its brief, argues strongly for the widest sort of discretion in the trial judge in these matters and urges that even if we find error or irregularity we disregard it as harmless and affirm the conviction. We are well aware of the necessity that appellate courts give the trial judge wide latitude in control of cross-examination, especially in dealing with collateral evidence as to character. But this principle cannot be expanded to justify a curtailment which keeps from the jury relevant and important facts bearing on the trustworthiness of crucial testimony. Reversals should not be based on trivial, theoretical and harmless rulings. But we cannot say that these errors were unlikely to have influenced the jury's verdict. We believe they prejudiced substantial rights and the judgment must be reversed.

[¶ 48.] The trial court apparently misread our holdings in the above cases. In *Knecht*, we upheld the trial court's ruling that the defendant could not introduce specific instances of the victim's violent nature to bolster his self-defense theory unless those incidents were known to defendant at the time he shot and killed the victim. 1997 SD 53 at ¶ 15, 563 N.W.2d at 419. However, pertinent to this case is our statement regarding impeachment:

> Knecht also argues specific instances of violent conduct should have been allowed to impeach any witness whose testimony downplayed Marshall's violent nature. While *we agree,* see [SDCL 19–12–6] and *Black v. Class,* 1997 SD 22, ¶¶ 19–23, 560 N.W.2d 544, 549–50, Knecht offers neither a specific instance nor a reference to the record to show he was denied that opportunity.

*Id.* n.4 (emphasis added); *see also Black,* 1997 SD 22 at ¶ 23, 560 N.W.2d at 550 ("Black would have been able to use this information during cross-examination of this witness, as well as support his theory of defense."). The other cases relied upon by the trial court all primarily deal with the rules pertaining to a self-defense theory.

*Latham,* 519 N.W.2d at 71; *Dokken,* 385 N.W.2d at 501–02; *Padgett,* 291 N.W.2d at 798–99. Defense counsel made it clear that he was not arguing a self-defense theory and the trial court's reliance on these cases was clear error.

[¶ 49.] As noted, SDCL 19–12–6 expressly permits the use of specific instances of conduct for impeachment on cross-examination when a witness testifies as to reputation or opinion of a person's character.

[¶ 50.] The trial court's evidentiary rulings unfairly prejudiced Hart. State was allowed to disparage Hart's character while glorifying that of Chips'—*all in its case-in-chief, an inherently unfair tactic.* To compound that error, the trial court unfairly tied Hart's hands by preventing him from employing a statutorily sanctioned method of impeachment.

[¶ 51.] Contrary to State's brief, this cannot constitute "harmless error." This court has repeatedly stated that the harmless error rule ought never be used to justify unfairness at the trial. *See, e.g., State v. Webb,* 251 N.W.2d 687, 689 (S.D.1977):

> We, however, are of the opinion that the harmless error rule ought never be used to justify unfairness at the trial. Every practicing attorney knows that where a prejudicial and improper question, such as the one here, is asked for the sole purpose of conveying to the jury information that counsel knows or should have known is excludable by the rules of evidence it is pure fiction to suppose that the damage done is eradicable by objection and/or cautionary instructions.

*Accord State v. Weber,* 487 N.W.2d 25, 29 (S.D.1992); *Dokken,* 385 N.W.2d at 500.

[¶ 52.] If this court affirms this case, it will overrule (without saying so) our most recent case on point, *Black v. Class,* 1997 SD 22, 560 N.W.2d 544, a unanimous opinion.

[¶ 53.] We should reverse and remand for a fair trial.