1999 SD 58

**STATE of South Dakota, Plaintiff and Appellee,**

v.

**Benny LAIBLE, Defendant and Appellant.**

**No. 20334.**

Supreme Court of South Dakota.

Argued Oct. 19, 1998.

Decided May 12, 1999.

Mark Barnett, Attorney General, Constance K. Nilles, Assistant Attorney General, Pierre, South Dakota, Attorneys for plaintiff and appellee.

Chris A. Nipe of Larson and Nipe, Mitchell, South Dakota, Attorney for defendant and appellant.

KONENKAMP, Justice.

[¶ 1.] Defendant, Ben Laible, appeals a jury verdict finding him guilty but mentally ill of second degree murder. He asserts multiple evidentiary and constitutional errors in his trial. We affirm on all issues.

### Facts

[¶ 2.] Kathleen Laible, a sixty-seven-year-old widow, lived on her farm near Howard, South Dakota. In August 1996, her adult son, Ben, moved back in with her. It was not the first time. Over the years he often stayed with her for extended periods. Although she loved all her children, she felt especially protective of her "Benny." He suffered from long-term mental illness, requiring frequent hospitalization for treatment. In between, he struggled to live and work on his own. His condition, variously diagnosed as bipolar disorder, schizoaffective disorder, and schizophrenia, required a regular dosage of antipsychotic medicine. As he had a history of noncompliance with taking his prescription, community health providers usually administered it in monthly injections. At home, especially when off his medication, he occasionally became abusive toward his mother. These episodes included profanity and, sometimes, physical violence. At the time of her death, Ben reportedly had not been regularly taking his medication.

[¶ 3.] On September 26, 1996, the Sheriff's Office in Miner County received a telephone call from one of Kathleen's out-of-state family members, asking for someone to check on her. Unable to reach her by telephone for two days, the family had grown concerned. Sheriff Tim Reisch drove out to her rural residence. When he arrived, he noticed there had been no travel on the driveway for at least a day. Wet from a heavy rain the day before, the road would have revealed vehicle tracks.

[¶ 4.] Reisch found Kathleen on her kitchen floor—shot to death. She was on her back, her left arm outstretched, her right arm across her chest, with an unmistakable shotgun wound to her head. Resting between her arms, with the barrel facing toward her, was a .12 gauge shotgun. To Reisch, the scene first suggested suicide. But on closer inspection he noticed the gun's partly open chamber and a spent shell on the floor nearby. Fragments of a telephone that once hung on the wall were scattered next to and underneath her body.

[¶ 5.] Ben, an immediate suspect, could not be found. A day later he was apprehended in Storm Lake, Iowa. He was indicted for first degree murder, and in the alternative, second degree murder. In the months that followed he told family members that his mother's death was an accident. He told a cellmate, on the other hand, "Well, if you had a mother like mine,

you'd shot her, too." Following a competency hearing, the trial court ruled Ben mentally competent to stand trial. He pleaded not guilty and not guilty by reason of insanity to both charges.

[¶ 6.] At trial, the state introduced remarks Kathleen had made to her daughters about her difficulties with Ben. She told them that Ben pushed and shoved her, knocked her down, put his hands around her neck, and called her crude and abusive names. The daughters personally witnessed some of Ben's name calling and abusive behavior. The trial court admitted these statements and events as relevant to prove a motive for murder and the hostile attitude toward his mother that Ben sometimes revealed. On cross-examination, these same witnesses admitted that Ben at times had been verbally abusive to them. The defense also brought out that Ben had struck his mother so hard once that it left a "huge bruise on her buttocks." Kathleen had reported to one of her daughters that Ben kept "a sawed-off shotgun." The gun found lying on her body had its stock sawed off. Ben himself told various people about his desire to have the farm and predicted he was "going to shoot [his mother] some day."

[¶ 7.] In the medical examiner's assessment, a single shot to the head killed Kathleen. He pronounced it a homicide. She died on September 24, two days before the Sheriff discovered her remains. Forensic analysis revealed that, at the time of firing, the gun was between eight inches and three feet from her face. And her head was approximately twenty-two inches from the ground, meaning she was on the floor at the time of the shooting. She had bruises on her arm signifying that during the attack she may have put her arms up to defend herself. A bruise on her shoulder, according to the medical examiner, could have been caused by a blow from a tubular object, like a gun barrel.

[¶ 8.] Before jury deliberations, the defense moved to have SDCL 22–16–7 declared unconstitutional for vagueness ab-sent a clarifying jury instruction on the definition of "depraved mind." The trial court denied the motion. The jury returned a guilty but mentally ill verdict of second degree murder, pursuant to § 22–16–7. Ben was sentenced to life in prison.

[¶ 9.] He now appeals his conviction raising the following issues: (1) "Is the evidence insufficient to sustain a verdict of guilty of second degree murder (but mentally ill)?" (2) "Under the facts of this case, is SDCL 22–16–7 unconstitutional because of vagueness?" (3) "Is SDCL 22–16–7 unconstitutional because of the equal protection clause of the United States Constitution?" (4) "Was the defendant denied a fair trial because the trial court refused his proposed jury instructions relating to the charge of second degree murder?" (5) "Should testimony that the defendant called his mother horrible names have been admitted into evidence at trial?" For the sake of clarity and brevity, we combine issues 2, 3 and 4 in Part 2 below.

### Standard of Review

[¶ 10.] When examining the sufficiency of the evidence on appeal, the question is whether the evidence will support a finding of guilt beyond a reasonable doubt. *State v. Baker*, 440 N.W.2d 284, 287 (S.D. 1989) (citation omitted); *see also State v. Big Head*, 363 N.W.2d 556 (S.D.1985). We view the evidence, and its most favorable inferences, in support of the verdict. *State v. Banks*, 387 N.W.2d 19, 27 (S.D.1986) (citation omitted). We will not reexamine a jury's assessment on which witness bears more credibility or which expert's opinion carries greater weight. *State v. Burtzlaff*, 493 N.W.2d 1, 4–5 (S.D.1992) (citations omitted); *Baker*, 440 N.W.2d at 287 (citing *State v. Swallow*, 350 N.W.2d 606 (S.D. 1984)). With constitutional challenges, we sustain legislative enactments absent clear and unmistakable unconstitutionality. *Taylor Properties, Inc. v. Union County*, 1998 SD 90, ¶ 10, 583 N.W.2d 638, 640; *State v. Morrison*, 341 N.W.2d 635, 637 (S.D.1983); *State v. Crelly*, 313 N.W.2d 455, 456 (S.D.1981). A statute is pre-

sumed constitutional until the contrary is shown beyond a reasonable doubt. *Baker*, 440 N.W.2d at 287 (citing *State v. Bonrud*, 393 N.W.2d 785 (S.D.1986)(other citations omitted)). Questions of law are reviewed de novo. *State v. Nguyen*, 1997 SD 47, ¶ 20, 563 N.W.2d 120, 124; *see also In re Estate of O'Keefe*, 1998 SD 92, ¶ 7, 583 N.W.2d 138, 139 (citation omitted). Evidentiary rulings of the trial court are presumed correct and are reviewed under the abuse of discretion standard. *Nguyen*, 1997 SD 47, ¶ 9, 563 N.W.2d at 122 (citations omitted).

### Analysis and Decision
#### 1. Sufficiency of the Evidence

[¶ 11.] In trial, the State sought a conviction on the more serious charge of first degree murder, but the jury returned a verdict on the lower alternative charge of second degree murder. Defendant contends the evidence was insufficient to sustain this verdict. The offense is defined in SDCL 22–16–7:

> Homicide is murder in the second degree when perpetrated by any act imminently dangerous to others and evincing a depraved mind, regardless of human life, although without any premeditated design to effect the death of any particular individual.

Defendant believes that nothing presented at trial proved he acted with a depraved mind. He points to the lack of evidence to show he acted "without any premeditation to effect the death of any particular individual." The bulk of the State's evidence, defendant argues, was offered to prove premeditation by showing he had a motive to kill his mother (he wanted the farm), expressed the thought of killing her to others, told people his mother was "just about dead," engaged in a pattern of behavior that upset and tormented her in the last days of her life, arranged the crime scene so that it appeared she committed suicide, attempted to get rid of evidence (a blood spattered shirt) that linked him to Kathleen's death, and then fled South Dakota. These actions, he contends, show an apparent deliberative plan to kill, not the type of reckless behavior evincing a depraved mind. Therefore, defendant concludes, he is either guilty of first degree murder or manslaughter, or he is guilty of nothing, but he is not guilty of second degree murder.

[¶ 12.] In support of his argument, defendant relies on *Godfrey v. Georgia*, 446 U.S. 420, 100 S.Ct. 1759, 64 L.Ed.2d 398 (1980). In *Godfrey*, the United States Supreme Court examined a death sentence where the defendant shot and killed his wife and mother-in-law, each by a single shotgun blast to the head. 446 U.S. at 425, 100 S.Ct. at 1763. The question in the case was whether the Georgia Supreme Court had correctly applied a constitutional construction to the phrase in the death penalty statute that called for a finding beyond a reasonable doubt that the defendant's actions were "outrageously or wantonly vile, horrible or inhuman in that it involved torture, depravity of mind, or an aggravated battery to the victim." *Id.* at 422–23, 100 S.Ct. at 1762. The Court concluded that Godfrey's actions did not reveal depravity of mind because, among other things, his victims were killed instantly. *Id.* at 432–33, 100 S.Ct. at 1767.

[¶ 13.] Defendant's reliance on *Godfrey* is misplaced. *Godfrey* interpreted a death penalty statute, not a murder statute. *Godfrey* did not give a definition of depraved mind; it merely stated that Godfrey's actions indicated no state of mind any more depraved than others guilty of murder. *Id.* at 433, 100 S.Ct. at 1767. Recently, in *State v. Hart*, we stated that "[i]f a person is able to act with 'a lack of regard for the life of another,' then that person can be convicted of second degree murder." 1998 SD 93, ¶ 16, 584 N.W.2d 863, 866. Further, we held that a depraved mind is defined differently as an aggravating circumstance in a death penalty context, than it is in our homicide statutory scheme. *Id.* ¶¶ 16–17, 584 N.W.2d at 866.

[¶ 14.] The evidence was sufficient to show that defendant committed an imminently dangerous act evincing depravity of mind, without regard for human life. Kathleen's bruised body was found lying amid smashed telephone parts, indicating a struggle, and perhaps extreme rage and intent to deny her contact with family members. She was shot in the face at extremely close range while on the floor. We cannot say the jury erred in finding defendant's actions showed indifference to human life and behavior evincing depravity. The trial court correctly instructed that "whether conduct is imminently dangerous to others and evincing a depraved mind regardless of human life is to be determined from the conduct itself and the circumstances of its commission." We conclude the evidence was sufficient to sustain the second degree murder conviction.

## 2. Constitutionality of SDCL 22–16–7

[¶ 15.] Defendant asserts that § 22–16–7 is unconstitutionally vague as applied to him under these facts. We considered a similar constitutional attack in *State v. Primeaux*, 328 N.W.2d 256 (S.D.1982). There, we applied the following standard to decide whether the statute was unconstitutionally vague: a statute must give fair notice that contemplated conduct is prohibited. *Primeaux*, 328 N.W.2d at 258 (citing *State v. Bad Heart Bull*, 257 N.W.2d 715, 720 (S.D.1977) (citations omitted)). We deduced in *Primeaux* that the Legislature's mandate was not vague, and found that the phrase "evincing a depraved mind" is not "subject to uneven application and interpretation." *Id.* at 258. The statute gave fair notice of what conduct is forbidden. *Id.* Although *Primeaux* addressed the statute in light of asserted ambiguities between second degree murder and first degree manslaughter, we think its reasoning holds true here as well. We decline to overrule *Primeaux*.

[¶ 16.] At trial, several mental health experts explained the typical symptoms of defendant's diagnosed mental illnesses, the force those illnesses had on his thought processes, the effect of his medication, and the consequence of not taking it. The court properly instructed on the definition of "depraved mind." Jurors were thus able to compare the expert testimony and the definition to determine the difference between actions evincing a depraved mind and those stemming strictly from defendant's mental disorders. "Sanity and intent are distinct issues." *Godfrey v. Kemp*, 836 F.2d 1557, 1562 (11thCir.1988), *reh'g denied*, 842 F.2d 339 (11thCir.1988), *cert. dismissed sub nom. Zant v. Godfrey*, 487 U.S. 1264, 109 S.Ct. 27, 101 L.Ed.2d 977 (1988). We think the jury was informed adequately to understand the distinction.

[¶ 17.] Nonetheless, defendant fears the jury may still have mistaken mental infirmity for moral depravity. To what degree his expressed animosity for his mother was a product of his illness was not quantifiable. He believes that if his proposed instructions on the issue had been given the problem would have been allayed. His first proposed instruction stated: "A 'depraved mind' is a self-created condition and is not a mentally ill mind. Conduct arising from a mentally ill mind is not conduct evincing a depraved mind." His second proposed instruction defined conduct imminently dangerous evincing a depraved mind regardless of human life as being determinable by examining the conduct itself and the circumstances surrounding the act, and gave examples of particular conduct that would show a depraved mind. Defendant argues that he was denied a fair trial because the jury did not have adequate instructions to differentiate between mental depravity and mental illness. He urges us to create a requirement that juries be given instructions distinguishing the two. Defendant, however, cites no authority for the proposition that this type of jury instruction is either warranted or constitutionally required. In our own research, we found no dispositive case

supporting defendant's position. Nothing in the record suggests confusion over the differences between depravity of mind and mental illness.

■ [¶ 18.] Next, defendant contends § 22–16–7 denies equal protection to the mentally ill. The Equal Protection Clause of the Fourteenth Amendment to the United States Constitution prohibits enactments creating different classes based on criteria unrelated to any valid legislative purpose, resulting in disproportionate, uneven application or treatment of individuals or classes. *Baker*, 440 N.W.2d at 288–89 (citing *Behrns v. Burke*, 89 S.D. 96, 229 N.W.2d 86, 88 (1975) (citations omitted)). If created, a class must be " 'reasonable, not arbitrary, and must rest upon some ground of difference having a fair and substantial relation to the object of the legislation, so that all persons similarly circumstanced shall be treated alike.' " *Id.* at 289 (quoting *Behrns*, 229 N.W.2d at 88 (quoting *Reed v. Reed*, 404 U.S. 71, 76, 92 S.Ct. 251, 254, 30 L.Ed.2d 225, 229 (1971))). Similarly situated persons should receive the same treatment under a statute. *See generally Reed*, 404 U.S. at 76, 92 S.Ct. at 254 (statute providing dissimilar treatment for men and women similarly situated violated Equal Protection Clause); *mandate conformed to, Reed v. Reed*, 94 Idaho 542, 493 P.2d 701 (1972). The South Dakota Constitution has the same guarantees, found in Article VI, Section 18, ensuring equal protection of the law for all. " 'Equal protection does not require that all persons be dealt with identically, but it does require that a distinction made have some relevance to the purpose for which the classification is made.' " *City of Aberdeen v. Meidinger*, 89 S.D. 412, 233 N.W.2d 331, 334 (1975) (quoting *Baxstrom v. Herold*, 383 U.S. 107, 86 S.Ct. 760, 15 L.Ed.2d 620 (1966)). A court will generally give more scrutiny to statutes creating suspect classes.

■ [¶ 19.] Defendant argues that absent clarifying instructions informing the jury that mental illness is not equivalent to mental depravity, the statute imposed a burden on mentally ill defendants, not placed on others, thereby denying equal protection. In effect, defendant asks us to declare the mentally ill a suspect class. He believes the second degree murder statute treats the mentally ill differently and, in cases where such persons are at risk, strict scrutiny should be applied. Although this is an interesting argument, we cannot find any case, and counsel cites us to none, holding that mentally ill persons form a suspect class. On the contrary, what sparse authorities can be found generally suggest that the mentally impaired are not a suspect class, and therefore, laws touching on their criminal accountability are only entitled to rational basis scrutiny. *See generally City of Cleburne v. Cleburne Living Ctr.*, 473 U.S. 432, 442–46, 105 S.Ct. 3249, 3255–57, 87 L.Ed.2d 313 (1985)(holding that the mentally retarded are not a quasi-suspect class, thus legislation pertaining to the group receives rational basis scrutiny); *Milner v. Apfel*, 148 F.3d 812 (7th Cir. 1998)(state statute denying social security benefits to institutionalized persons acquitted of murder by reason of insanity not violative of the Equal Protection Clause as insane persons are not a suspect class). We previously reviewed this issue and found that the mentally ill are not entitled to a strict scrutiny analysis. *Baker*, 440 N.W.2d at 289. Further, we have concluded that § 22–16–7 is not unconstitutionally vague and is not susceptible to misinterpretation and uneven application. *Primeaux*, 328 N.W.2d at 258. The statute is constitutional as applied to defendant.

### 3. Vulgar and Abusive Names

■ [¶ 20.] Finally, defendant asserts error in allowing testimony detailing the abusive and vulgar names he called his mother. Defendant's primary concern is that the evidence of name calling by itself, unattached to any alleged aggressive acts, simply portrayed him as a bad person. Proving the commission of a charged crime

by showing an accused committed other wrongs is impermissible character evidence. Admission of other acts evidence is permissible, however, when appropriate to prove some fact other than character.

> Evidence of other crimes, wrongs, or acts is not admissible to prove the character of a person in order to show that he acted in conformity therewith. It may, however, be admissible for other purposes, such as proof of motive, opportunity, intent, preparation, plan, knowledge, identity, or absence of mistake or accident.

SDCL 19–12–5 (Rule 404(b)).

[¶ 21.] Domestic abuse often has a history highly relevant to the truth-finding process. *See generally Burtzlaff,* 493 N.W.2d at 1. When an accused had a close relationship with the victim, prior aggression, threats or abusive treatment of the same victim by the same perpetrator are admissible when offered on relevant issues under Rule 404(b). *State v. Davi,* 504 N.W.2d 844, 850–51 (S.D.1993) (motive); *State v. Kerkhove,* 423 N.W.2d 160, 162–63 (S.D.1988) (identity, modus operandi, and motive); *see also People v. Zack,* 184 Cal.App.3d 409, 413–15, 229 Cal.Rptr. 317, 319–20 (Cal.Ct.App.1986) (admitted under California's equivalent to § 404(b)). The rationale for admissibility is that an accused's past conduct in a familial context tends to explain later interactions between the same persons. Defendant's persistent verbal abuse, though not always accompanied by violence or threats, was an expression of his attitude, inseparable from his intermittent aggression. His previous attacks and threats, along with the vulgar names he called his mother were therefore admissible to show the nature of their relationship, his motive, and his state of mind. In our view, there was ample justification in the record to support the judge's finding that this evidence was relevant.

[¶ 22.] Other courts have also held admissible prior abusive behavior against the same victim by the same defendant in a domestic relationship. *See People v. Linkenauger,* 32 Cal.App.4th 1603, 1612–13, 38 Cal.Rptr.2d 868, 873–74 (Cal.Ct.App.1995) (under California's equivalent to Rule 404(b), evidence of prior domestic quarrels, jealousy, and threats admissible to show defendant's motive, intent and state of mind); *Lindsey v. State,* 135 Ga.App. 122, 218 S.E.2d 30, 31 (1975) (prior attempts to commit same crime against same victim generally admissible); *State v. Gibbons,* 256 Kan. 951, 889 P.2d 772, 780 (1995) (evidence of earlier spousal abuse admissible to show motive or intent, the parties' relationship, the continuing course of conduct, and corroboration); *State v. Elvin,* 481 N.W.2d 571, 575 (Minn.Ct.App.1992) (evidence of prior domestic violence admissible to show relationship between victim and defendant), *review denied* (1992); *State v. Johnson,* 73 Ohio Misc.2d 1, 657 N.E.2d 383, 384 (Ohio 1994) (defendant's earlier convictions for crimes of violence against same victim admissible in domestic violence threat case to prove element of crime charged and intent, motive, or absence of mistake or accident).

[¶ 23.] Next, we review the trial court's ruling that this evidence was not substantially more prejudicial than probative. SDCL 19–12–3 (Rule 403) provides:

> Although relevant, evidence may be excluded if its probative value is substantially outweighed by the danger of unfair prejudice, confusion of the issues, or misleading the jury, or by considerations of undue delay, waste of time, or needless presentation of cumulative evidence.

The court excluded some of the past remarks, allowing only those statements relevant to defendant's motive, state of mind, or the nature of the relationship. Defendant was certainly not entitled to have the jury decide his case on a pretense that his behavior and feelings toward his mother were nothing but routinely warm and affectionate. *See Zack,* 184 Cal.App.3d at 415, 229 Cal.Rptr. at 320. The court also properly instructed the jury on the limited

purposes for which the evidence could be considered. *See* SDCL 19–9–12 (Rule 105). Given the relevance and revealing nature of these statements, the court did not abuse its discretion in finding that the danger of unfair prejudice did not substantially outweigh probative value.

[¶ 24.] Affirmed.

[¶ 25.] MILLER, Chief Justice, and SABERS, AMUNDSON, and GILBERTSON, Justices, concur.